**HOOSIER PENN OIL COMPANY,**
Plaintiff–Appellant,

v.

**ASHLAND OIL COMPANY,**
Defendant–Appellee.

No. 90–1693.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1991.

Decided June 13, 1991.

As Corrected June 19, 1991.

Gregory J. Bubalo, James N.G. Cauthen, Jeanne R. Clemens, Ogden, Sturgill & Welch, Louisville, Ky., for plaintiff-appellant.

Malcolm C. Mallette, Mark R. Wenzel, Krieg, Devault & Alexander, Indianapolis, Ind., Merrill S. Schell, Debra D. Poulin, Carole D. Christian, K. Gregory Haynes, Wyatt, Tarrant & Combs, Louisville, Ky., for defendant-appellee.

Before WOOD, Jr., COFFEY, and MANION, Circuit Judges.

MANION, Circuit Judge.

Hoosier Penn Oil Company sought a preliminary injunction to prevent Ashland Oil Company from terminating its contract with Hoosier to distribute Valvoline Oil products. Because Hoosier was not an Ashland franchise under Indiana law, we affirm the district court's denial of the preliminary injunction.

## I.

Hoosier began distributing Valvoline oil and lubricant products in 1978, and formalized its relationship with Ashland's Valvoline Oil Company Division on March 16, 1982 by entering into a distributor agreement. The agreement set out a number of details regarding Hoosier's obligation to purchase Valvoline oil, promote the sale of Valvoline products, and cooperate in Valvoline's promotional campaigns. However, the agreement did not prevent Hoosier from distributing many other competing brands of motor oil, including Quaker State, Castrol, Motorcraft, Kendall, Shell and Chevron, along with its own private label, HP Oil. According to Hoosier's president, Terry Blakely, Hoosier sold about twenty different brands of motor oil, and had distributor agreements with eight or ten manufacturers of major brands. Hoosier admitted that Valvoline was not even its number-one seller: of all the motor oil brands sold by Hoosier, Valvoline was "at a minimum ... its second leading brand in sales volume ...", constituting about 20 percent of its motor oil sales. Valvoline products were about 10 percent of Hoosier's overall sales. According to Blakely, Hoosier's letterhead designated it as a distributor of Valvoline products, and Hoosier used invoices with the Valvoline logo to bill customers, even those buying oil of a Valvoline competitor. However, according to Hoosier Penn Treasurer Charles Wesley Jefferson, Hoosier did not use the Valvoline logo when it corresponded with *suppliers* of a product in competition with Valvoline; for example, the Valvoline logo would not be used on a letter sent to Quaker State.

In September of 1988, Hoosier and two other distributors sued Ashland, alleging that it sold Valvoline oil products to other distributors at a lower price in violation of prohibitions on price discrimination contained in the Robinson–Patman Act, 15 U.S.C. § 13(a), and related Kentucky statutes.

On July 18, 1989, Ashland gave notice to Hoosier that its Valvoline distributorship would be terminated in 90 days. In response Hoosier filed a motion in the district court for a temporary restraining order and preliminary injunction preventing the termination, alleging that the distributor agreement was a "franchise" under Indiana's Deceptive Franchise Practices Act, and could not be terminated without cause. Hoosier also amended its complaint to seek damages for breach of the distributor agreement and for an illegal conspiracy to terminate Hoosier as a Valvoline distributor.

In preparation for an August 30, 1989 hearing on Hoosier's motion for preliminary injunction, the parties engaged in discovery to develop a record concerning the nature of the relationship between Ashland and Hoosier. At the August 30 hearing the district court determined that whether Hoosier was a franchise under Indiana law was a threshold question, and suggested to the parties that the matter might be resolved on motions for summary judgment. The parties filed cross motions for summary judgment.

The distributor agreement had no expiration date, and provided for termination without cause by either party at any time:

Either Valvoline or Buyer may terminate this Agreement at any time by furnishing the other party with written notice of termination not less than ninety (90) days (or such longer period as may be expressly required by law) prior to the effective date of termination.

(Distributor Agreement, paragraph 16(a).)

The agreement provides that Kentucky law will govern its provisions; Kentucky law allows termination of at-will contracts

without cause. Therefore Ashland argues that its termination of the Hoosier distributorship was executed according to the agreement.

However, Hoosier argues that another provision overrides Kentucky law. Because the agreement is in general form so it can be used in any state, it provides that "any provision herein contained which in any way contravenes the laws of any state ... may be deemed to be deleted" from the agreement. (Distributor Agreement, paragraph 15(d).) Hoosier argues that the at-will termination clause "contravenes" an Indiana law which prohibits the termination of franchises without cause, and is therefore deleted from the agreement. I.C. 23–2–2.7–1. A "franchise" is defined in I.C. 23–2–2.5–1(a) as "a contract by which:"

(1) A franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;

(2) The operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; ... [1]

The issue facing the district court was whether the relationship between Hoosier and Ashland was a franchise under Indiana law. Aided by the discovery conducted by the parties, the district court thoroughly examined the agreement to determine whether it met the Indiana definition of a franchise. On February 21, 1990, the district court ruled that Ashland and Hoosier did not have a franchise relationship under Indiana law:

[T]he court is of the opinion and now finds that the Agreement does not meet either part of the statutory definition of a franchise. There was and is no marketing plan or system prescribed in substantial part by Valvoline. Also, the business of Hoosier is not operated pursuant to such a plan nor substantially associated with Valvoline.

Therefore, the court concluded that Kentucky law—which allows termination without cause of a distributor agreement—applied to the agreement, and Ashland's termination of Hoosier was proper. The court entered summary judgment for Ashland, and Hoosier appealed.

## II.

We owe "substantial deference" to the district court's decision to deny the preliminary injunction sought by Hoosier. *American Hospital Supply v. Hospital Products Ltd.*, 780 F.2d 589, 594 (7th Cir.1985). In general, we review the district court's decision for an abuse of discretion; however, when we decide whether a legal or factual error constitutes an abuse of discretion, our standard is "tailored to the various functions that the district court must perform in fulfillment of its responsibilities." *Thornton v. Barnes*, 890 F.2d 1380, 1384 (7th Cir.1989). Thus, " 'the factual determinations are reviewed under a clearly erroneous standard and the necessary legal conclusions are given *de novo* review. However, the ultimate evaluation and balancing of the equitable factors is a highly discretionary decision and one to which this court must give substantial deference.' " *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1011 (7th Cir. 1990), quoting *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir. 1986) (citations omitted). Ultimately, "it is not enough that we think we would have acted differently in the district judge's shoes; we must have a strong conviction that he exceeded the permissible bounds of

---

**1.** A third clause in the statute requiring payment of a franchise fee does not apply to a franchise which relates to "... the business of selling gasoline and/or oil primarily for use in vehicles with or without the sale of accessory items;" I.C. 23–2–2.7–5. Hoosier claimed the benefit of this exception. While the district court questioned whether this exception applied to distrib- utors of oil, rather than only filling stations and other retailers, it did not reach the issue because Ashland failed to argue that the exception did not apply. For that reason, and because Ashland also fails to contest the issue on appeal, we will assume that Hoosier need only prove that the first two requirements of I.C. 23–2–2.5–1(a) are met.

judgment." *American Hospital,* 780 F.2d at 595.

Hoosier alleges that the district court made two errors—one legal, and one factual, in determining that Hoosier did not meet the statutory test for a franchise. First, Hoosier contends that the district court's factual findings relating to whether the "marketing plan or system [was] prescribed in substantial part" by Ashland were clearly erroneous. Second, Hoosier argues that the district court misapplied the law on the second statutory requirement for a franchise—whether the operation of Hoosier's business is "substantially associated" with the Valvoline logo.

■ Hoosier lists several elements of control Ashland asserted over it, according to the agreement, including: a requirement of a minimum gallonage purchase per year; designation of Hoosier's primary sales area; a requirement that Hoosier use its best efforts to promote sales; a requirement that Hoosier cooperate with and use Valvoline field representatives, and participate in Valvoline promotional programs; and a requirement that Valvoline approve advertising for its products.

Both parties rely, as did the district court, on one of the few Indiana cases construing this provision of the Franchise Act, *Master Abrasives Corp. v. Williams,* 469 N.E.2d 1196 (Ind.App.1984). Master Abrasives claimed on appeal that its contract with Williams did not meet the definition of franchise in I.C. 23–2–2.5–1(a). The Indiana Court of Appeals disagreed, and described the factors that "indicate[d] the existence of a marketing plan or system." 469 N.E.2d at 1200. That agreement, among other things: divided the state into marketing areas; authorized the establishment of sales quotas; gave Master approval rights of any sales personnel Williams sought to employ; and established mandatory sales training by Master for Williams' sales employees, where the employees were instructed on which customers to contact, which customers to emphasize, and Master's policy on giving samples. Further, Williams' sales personnel were required to collect information on product usage from the customers. This information was required to be submitted to Master so it could determine which product to sell to the customer. Williams' sales personnel therefore could not even sell Master's products without prior approval from Master.

Any similarities between that agreement and the agreement between Ashland and Hoosier are superficial. Hoosier attempts to wrap the provisions of this agreement with the fabric that holds the *Master Abrasives* design together. It doesn't fit. First, the marketing areas prescribed in *Master Abrasives* were exclusive. Hoosier's agreement is a non-exclusive distributorship; Hoosier may sell in other areas, and other distributors sell in Hoosier's area. Second, Ashland had no control over who Hoosier hired as sales employees. Third, the sales training offered to Hoosier employees by Ashland was not mandatory, and Hoosier's president testified that Hoosier used it only when convenient. Fourth, although there were minimum gallonage purchase requirements, Ashland did not impose a sales quota. Fifth, Ashland had no control over what Hoosier's employees emphasized to purchasers, and did not tell Hoosier which customers to sell to. There are other differences between the agreement in *Master Abrasives* and this one, but these should suffice to distinguish the case.

Hoosier also argues that paragraph 4 of the agreement mandates Hoosier's participation in all Valvoline promotional programs. It is true that the language of paragraph 4 is mandatory, but paragraph 13 indicates that Hoosier was merely given the option of participating in some promotional programs. The evidence is undisputed, as established by Hoosier's own president, that Hoosier did not participate in all of the promotional programs Hoosier now claims were mandatory under the agreement. We conclude that the district court's factual findings were not clearly erroneous, and Ashland does not meet the statutory requirement that a franchisee's marketing plan be prescribed in substantial part by the franchisor.

■ That in itself is sufficient to affirm the district court, since Hoosier must prove

both clauses of the statutory definition to qualify as a "franchise." We also point out that I.C. 23–2–2.5–1(a)(2) requires that the operation of Hoosier's business "pursuant to such a plan" be substantially associated with Valvoline trade indicia. Since we have just determined that the (a)(1) definition of a "marketing plan or system prescribed in substantial part" by Ashland has not been met, the (a)(2) definition also cannot be met because there is no "plan" pursuant to which Hoosier's business is operated. However, even if we were to separately consider Hoosier's association with Valvoline's trade indicia, Hoosier fails to meet the (a)(2) test as well.

Hoosier argues that the district court made a legal error by considering this issue in the context of Hoosier's entire business, rather than considering whether "Hoosier Penn's business *under Valvoline's prescribed marketing plan* was substantially associated with Valvoline's trade indicia." In other words, the district court should merely have determined whether the Valvoline logo was used when Hoosier sold Valvoline products. This argument is made without citation to legal authority, and defies both the explicit statutory language and common sense. The district court properly rejected this argument, noting that "[o]bviously, the sales of Valvoline products are associated with the Valvoline trademark, etc.—the products come that way from Valvoline. But the same is true as to the products of other distributors." *See also Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672 (2d Cir.1985) (rejecting a similar argument as applied to Connecticut's nearly identical franchise act).

The district court did err in one small, non-material respect when it concluded that Hoosier only used the Valvoline logo to sell Valvoline products. The affidavit testimony established that the Valvoline logo was used the "majority" of the time, even on invoices to those who *purchased* products other than Valvoline. However, the logo was not used to correspond with vendors of motor oil, such as Chevron and Quaker

State, who were in competition with Valvoline. Charles Wesley Jefferson, the treasurer, director, and part-owner of Hoosier, stated that using the Valvoline logo when buying from Valvoline competitors was considered "inappropriate." In any event, the Valvoline logo was not always used in Hoosier's business correspondence. Further, only one of nine Hoosier delivery trucks bears the Valvoline logo. The drivers do not wear uniforms with the Valvoline logo. And most importantly, Hoosier sells twenty other brands of motor oil in competition with the Valvoline brand, and has similar distributor agreements with eight to ten of those competitors. Only 10 percent of Hoosier's overall sales volume is attributable to the sale of Valvoline products. The district court was correct to conclude that Hoosier is not "substantially associated" with Valvoline trade indicia. *See e.g., Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc.*, 846 F.2d 1095 (7th Cir.1988); *Grand Light, supra.*

The district court's denial of Hoosier's motion for preliminary injunction, and its grant of Ashland's motion for summary judgment, are therefore

AFFIRMED.