**DYNA–TEL, INCORPORATED,**
**Plaintiff–Appellee,**

v.

**LAKEWOOD ENGINEERING &**
**MANUFACTURING COMPANY,**
**Defendant–Appellant.**

**No. 90–3813.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1991.

Decided Oct. 23, 1991.

Robert E. Gyemant, Dennis Babbits (argued), San Francisco, Cal., Lowell D. Snorf, Phillips, Healy & Allen, Beverly J. Klein, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellee.

William R. Sullivan, Jr., Timothy F. Haley (argued), Thomas H. Peckham, Sey-

farth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., POSNER, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

Dyna–Tel, Inc. brought this diversity suit against Lakewood Engineering and Manufacturing Company, a manufacturer of electric fans, claiming that Lakewood had refused to pay it for electric-fan motors that Dyna–Tel had sold and delivered to Lakewood. As is usual and proper in diversity cases where the parties fail to make an issue of choice of law, the district judge, brushing aside Dyna–Tel's feeble and irrelevant effort renewed in this court to show that California law governs the issue of estoppel (irrelevant because Dyna–Tel has failed to suggest any material differences between California and Illinois law on the question, *International Administrators, Inc. v. Life Ins. Co.*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985)), applied Illinois law. Illinois is the state where the suit was brought; forum law is the default rule for choice of law questions. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991).

After a two-day bench trial, Judge Marshall awarded Dyna–Tel damages of $634,-000. Having previously paid the entities that it believed had owned the fans it bought and were entitled to the money for them, Lakewood is understandably upset at the prospect of having to pay again. It argues that the judge either misread the contract or should have accepted Lakewood's defense of estoppel.

Vivek Hejmadi organized Dyna–Tel in the early 1980s to buy electrical equipment for resale. He discovered that a Philippine company, Chemark Electric Motors, Inc., was manufacturing a type of motor that Lakewood had previously bought from another company. Dyna–Tel became Chemark's distributor in the United States. Hejmadi visited James Larkin, a senior officer of Lakewood, to try to interest him in the motors. Larkin told Hejmadi to return with a representative from Chemark, because it was Lakewood's policy to deal directly with the manufacturer since the manufacturer controls key aspects of performance such as quality and timeliness. So a second meeting was held, attended by Antonio Garcia, the president of Chemark, along with Hejmadi and Larkin. At it an agreement in principle was reached that Chemark would build to the design of the motors Lakewood formerly had bought, and that, in Larkin's words, "Vic [Hejmadi] would take care of the details." One of the details was price. A price range was discussed at the meeting but Larkin thought it too high and Hejmadi was left to negotiate the price with Larkin. This was done over the next few weeks. Apparently the deal between Chemark and Dyna–Tel was that Dyna–Tel would keep 15 percent of the sales price to Lakewood and remit the balance to Chemark, but the record is vague on the exact percentage. At Lakewood's request Dyna–Tel obtained an Underwriters' Laboratory seal of approval for the motors and added Lakewood as an additional insured party on Dyna–Tel's products-liability insurance policy. At Dyna–Tel's request Lakewood obtained a letter of credit entitling Dyna–Tel to payment for the motors upon presentation of documents indicating their delivery to Lakewood. Lakewood listed Dyna–Tel on its books as an account payable.

Chemark shipped the motors directly to Lakewood pursuant to two purchase orders that Lakewood sent Dyna–Tel in November 1983. Lakewood typed the orders on its printed order form, and in the space for the addressee appears

Chemark Electric Motors, Inc.

c/o Dyna–Tel, Inc.,

360 E. 72nd St., Apt. B–403

New York, NY 10021

—which is Dyna–Tel's address. The purchase price was approximately $1.6 million.

Everything proceeded swimmingly for a time and Lakewood had paid Dyna–Tel about $1 million when a three-cornered dispute arose among Lakewood, Chemark, and Dyna–Tel. Lakewood complained about late delivery from Chemark. Dyna–Tel refused to pay Chemark unless Che-

mark accelerated its deliveries to Lakewood. Meanwhile the principals of Chemark had created a new corporation, Advanced Motor Technology (Amtek), to distribute Chemark's motors in the U.S.; this may have led to friction with Dyna–Tel too, although the record is unclear. In any event, either Chemark or Amtek told Lakewood not to make any further payments for the motors that it had received until the dispute between Dyna–Tel on the one side and Chemark and Amtek on the other was resolved. Chemark then sued Dyna–Tel in California for the payments that Dyna–Tel was withholding. That suit was settled on September 22, 1985, by the execution by Chemark and Dyna–Tel of a document entitled "Settlement Agreement and Release." The agreement (we'll call it the settlement agreement) required the parties to execute another agreement, the Release and Assignment (which we'll call the assignment agreement), assigning to Chemark all Dyna–Tel's rights to payment by Lakewood. The parties duly executed this agreement too. The settlement agreement went on to provide that the validity of the assignment was contingent on the performance of the other covenants in the settlement agreement, including an undertaking by the parties to create a new corporation, jointly owned by the parties, which would become Chemark's exclusive distributor in the United States. These conditions did not appear in the assignment agreement itself, however.

Three days after the signing of these agreements, Amtek sued Lakewood in federal district court in Chicago, seeking to recover the unpaid balance of the motors; this was essentially the same suit that Dyna–Tel was later to bring in the same court and that is before us on this appeal. It is a mystery why *Amtek* was the plaintiff, given the assignment to Chemark, and why a suit was necessary: for remember that it was either Chemark or Amtek that had told Lakewood to stop paying for the motors until the dispute involving Chemark, Amtek, and Dyna–Tel was resolved; and we shall see in a moment that Lakewood, while distressed by slow delivery, was willing to pay—it just wanted to know

whom to pay. However all this may be, Lakewood responded with a motion to dismiss the suit because of Amtek's failure to join as additional parties Chemark and Dyna–Tel, which in Lakewood's view were essential for a just adjudication. At about this time Beverly Klein, a lawyer representing Dyna–Tel, called Larkin and, according to his testimony (she did not testify), told him that she was looking for some money for Dyna–Tel. Larkin told her about the Amtek suit and suggested she call James Conlon, the lawyer handling the suit for Lakewood.

Chemark moved to intervene in Amtek's suit, claiming to be the party entitled to payment for the motors and in support of the claim attaching the assignment agreement, which showed that Dyna–Tel had assigned its own claim to Chemark. An odor of fraud is emitted by Chemark's intervention in Amtek's suit. Chemark did not advise the court that the validity of the assignment was contingent on the performance of the covenants in the settlement agreement—none of which Chemark had performed except the covenant to dismiss its suit in California. Nor did Chemark disclose that its principals had created Amtek, its supposed adversary.

Lakewood responded to the motion to intervene by filing a counterclaim in interpleader against Chemark and Amtek and by depositing in court its estimate of the unpaid balance of the purchase price for the motors. It did not name Dyna–Tel as an additional interpleader defendant, nor did Dyna–Tel seek to intervene in the interpleader action, though it knew about it.

On January 23, 1986, Chemark and Amtek settled their "dispute," divided the money on deposit in the court, and—vanished. One month after the funds on deposit in the court were disbursed to Chemark and Amtek, Dyna–Tel brought this suit against Lakewood, seeking the same funds that Chemark and Amtek had just walked off with (actually more) and pointing out that the assignment was invalid because Chemark had breached the covenants in the settlement agreement upon the

performance of which the assignment was conditional.

■ The first issue is whether the contract of sale was between Lakewood and Dyna–Tel or between Lakewood and Chemark. If the latter then Lakewood paid the right party after all and Dyna–Tel has no claim. This question depends on whether Dyna–Tel was a distributor, buying motors from Chemark and reselling them to Lakewood, or a mere sales agent, effecting a sale by Chemark of Chemark's motors to Lakewood in exchange for a commission. There is little doubt that as between Chemark and Dyna–Tel, Dyna–Tel was, at least by the time the purchase orders were sent, a distributor and not merely a sales agent. It is less clear what the situation was when the original contract was made between Lakewood and Dyna–Tel following the meeting among Larkin, Hejmadi, and Garcia. It is particularly unclear what Lakewood agreed to.

Lakewood denies there is any unclarity. The purchase orders, it says, are clear on their face. They are addressed to Chemark "in care of" Dyna–Tel, and everyone knows that if you send a letter to A in care of B the letter is meant for A, not B; B is just a receiving agent. Even courts know this. *Bellmer v. Charter Security Life Ins. Co.*, 140 Ill.App.3d 752, 759–60, 94 Ill.Dec. 945, 950, 488 N.E.2d 1338, 1343 (1986); *Moser v. Highway Commissioner*, 114 Ill.App.3d 137, 141, 69 Ill.Dec. 885, 888, 448 N.E.2d 603, 606 (1983). But this line of argument treats the purchase orders as the contracts. They are just invoices, and don't contain the complete agreement of the parties. They make no reference, for example, to the letter of credit—a crucial term. The complete agreement must be inferred from a series of meetings, documents, and acts, as in *McLean County Coal Co. v. City of Bloomington*, 234 Ill. 90, 96–97, 84 N.E. 624, 626 (1908), and *Mercantile Trust Co. v. Kastor*, 273 Ill. 332, 340, 112 N.E. 988, 991 (1916), or our very recent *Wood v. Mid–Valley Inc., supra*. In this larger setting the significance of "c/o" shrinks. It could just mean that since the purchase order would be filled by Chemark initially, because Chemark would be both manufacturing the motors and delivering them (they were to be drop shipped—that is, shipped directly from Chemark to Lakewood—rather than shipped first to Dyna–Tel, which as far as appears had no warehousing facilities), Dyna–Tel would be expected in the ordinary course of completing the transaction to forward the purchase order to Chemark so the latter would know what to do. Since the purchase orders also specify that the motors are to be approved by Underwriters' Laboratory, and Dyna–Tel rather than Chemark was responsible for obtaining that approval, it is apparent that the orders required performance by Dyna–Tel as well as by Chemark and therefore that Dyna–Tel was more than a mail box.

The fact that the letter of credit directed payment to Dyna–Tel, the fact that Dyna–Tel was the name of the relevant account payable on Lakewood's books, the fact that the purchase orders are the only place in Lakewood's files in which the name "Chemark" appears, even the fact that Dyna–Tel negotiated the price of the motors without consulting Chemark—none of these facts is decisive on the question whether Dyna–Tel was the actual seller. Foreign companies often confer broad authority on their U.S. agents without necessarily making them distributors in the sense of middlemen who actually take title to the goods. Still we cannot say that Judge Marshall committed a clear error—indeed that he committed any error—in concluding that Lakewood's contract was with Dyna–Tel. The "c/o" is less suggestive than Lakewood's conduct. If Lakewood thought it had a contract with Chemark, why didn't the name "Chemark" appear anywhere in Lakewood's books? Why didn't Lakewood insist on a written direction from Chemark to make the letter of credit payable to Dyna–Tel? The request came from Dyna–Tel and made no reference to Chemark. Why did Lakewood move to dismiss Amtek's suit for failure to join Dyna–Tel—on Lakewood's present telling a mere commission agent—as an indispensable party? There are answers to these questions but

Judge Marshall was not required to accept them.

■ The second issue is whether Dyna–Tel should be estopped to enforce the contract. Lakewood argues with considerable force that Dyna–Tel, by its actions and particularly its inactions, misled Lakewood into thinking that it was safe to give the purchase money to Chemark and Amtek to divide. Dyna–Tel knew of course that the assignment upon which Chemark had based its intervention in Amtek's suit was invalid because Chemark had breached the covenants in the settlement agreement upon which the assignment depended. Yet Dyna–Tel said nothing about this to Lakewood, leaving the latter to bask in a false belief that Chemark was indeed the assignee of all of Dyna–Tel's interest.

Dyna–Tel responds that it *did* say something. Klein told Larkin that Dyna–Tel was looking for money from Lakewood. That, Dyna–Tel argues, should have warned Larkin and through him Lakewood's lawyer, Conlon, that Dyna–Tel should be brought into the interpleader suit. To this Lakewood ripostes that the phone conversation took place several days before Chemark filed its motion to intervene in Amtek's suit and therefore before Conlon received the assignment agreement that indicated that any claim Dyna–Tel might once have had against Lakewood had been assigned to Chemark (maybe assigned after the phone conversation in which Dyna–Tel, through Klein, had asserted an interest). Dyna–Tel replies by pointing out that the assignment agreement was dated *before* the phone call, so Conlon should have realized that Dyna–Tel had not relinquished all interest in the matter. The date of the phone call, answers Lakewood, is not in the record. But Larkin admitted that he spoke to Klein after the agreement was signed—he just doesn't know how many days after.

The doctrine of equitable estoppel does not establish a general duty of altruism or solicitude. It does not transform every contract into a fiduciary undertaking. It requires proof of words or deeds (or sometimes omissions to speak or act) that create a misleading impression upon which a reasonable person would rely. *Vaughn v. Speaker*, 126 Ill.2d 150, 162–63, 127 Ill.Dec. 803, 808–09, 533 N.E.2d 885, 890–91 (1988). The conduct by Dyna–Tel that is alleged to estop it to enforce its contract with Lakewood consists of (1) Dyna–Tel's signing the assignment agreement, an agreement that Lakewood describes as a ruse to enable Chemark to extract payment from Lakewood, (2) Dyna–Tel's failure to reveal to Lakewood the existence of the settlement agreement, which qualified the assignment agreement in critical respects—indeed rendered the assignment invalid—and (3) Dyna–Tel's failure to intervene in the interpleader action. The first point, at least considered by itself, is shallow. Dyna–Tel signed the assignment agreement as consideration for the promises made by Chemark in the accompanying settlement agreement. Hejmadi was not represented by counsel when he signed it and it would be asking a lot of a layman to foresee that such a document, by virtue of its failure to disclose that it was contingent on the performance of another contract, could be used to inveigle someone else into paying the wrong party should that other contract be broken.

As for Dyna–Tel's failure to warn Lakewood of its potential exposure to liability, it *did* warn Lakewood—sort of, through Beverly Klein's call. But it was a lackluster warning, barren as it was of any reference to the crucial fact that the assignment—Chemark's sole warrant for seeking payment from Lakewood—was invalid. And it does seem extraordinary that Dyna–Tel should then have sat back, knowing that Lakewood was about to pay the wrong people, and have made no effort to intervene in the interpleader action—and then a month after Lakewood's money was gone have sued Lakewood for the purchase price. We may assume that by these acts (the signing of the potentially misleading assignment agreement, and the unspecific warning) and omissions (the failure to reveal the existence of the settlement agreement, to warn Lakewood that the assignment was invalid, or to intervene in the interpleader action), Dyna–Tel created a

misleading impression. So the first element of an equitable estoppel is present. But was it an impression that would have induced a *reasonable* person to believe that Dyna–Tel had no interest in the purchase money and could safely be ignored? That's an essential element too. *Blisset v. Blisset*, 123 Ill.2d 161, 169, 121 Ill.Dec. 931, 934, 526 N.E.2d 125, 128 (1988); *Wilson v. Illinois Benedictine College*, 112 Ill. App.3d 932, 939–40, 68 Ill.Dec. 257, 264, 445 N.E.2d 901, 908 (1983); *Viirre v. Zayre Stores, Inc.*, 212 Ill.App.3d 505, 513–16, 156 Ill.Dec. 622, 628–29, 571 N.E.2d 209, 215–16 (1991); *Byron Community Unit School v. Dunham–Bush, Inc.*, 215 Ill.App.3d 343, 347–48, 158 Ill.Dec. 990, 993, 574 N.E.2d 1383, 1386 (1991). The answer is no.

Lakewood, or its counsel, behaved with extreme imprudence. Here was Dyna–Tel, listed on the books of Lakewood as a creditor owed more than half a million dollars; Dyna–Tel, which Lakewood itself had seen fit to designate as an indispensable party in the suit by Amtek; Dyna–Tel, which through its lawyer had warned the responsible official of Lakewood that it was seeking money for the sale of the motors—its sale, after all. Although the assignment agreement looked good on its face and Chemark's counsel submitted an affidavit with Chemark's motion to intervene stating that Dyna–Tel had indeed assigned all its interest in the motors that were the subject of the litigation to Chemark, a clause in the agreement provided that the agreement could be modified by mutual consent, and Lakewood's counsel made no effort to check on the validity of the assignment with Dyna–Tel. Lakewood could not count on Dyna–Tel's intervening in the interpleader action. Why should it? So that it could fight with two or three parties rather than with one? If Lakewood wanted Dyna–Tel in there it could have interpleaded it. Its failure to do so is nearly incomprehensible considering the amount of money at stake.

One who wants to get out of his contractual obligations by reference to the careless behavior of his promisee must show that his own behavior was careful. We have here two innocent parties each out of pocket: Dyna–Tel because it has never been paid for motors that it bought from Chemark, Lakewood because it has already paid once for those motors. The parties' position is not symmetrical, however: Lakewood has broken its contract with Dyna–Tel. To rectify the balance it has tried to show that Dyna–Tel misled it. That is true. But Dyna–Tel was careless rather than willful, and Lakewood in its turn was careless in being taken in by the impression carelessly created. The pratfalls of the parties cancel, leaving a simple breach of contract.

Last, Lakewood quarrels with the amount of damages, asking that the judgment be reduced by $85,000 in order to reflect the fact that some of the motors that were delivered had a lower price, and to set off damages that it allegedly incurred as a result of late delivery and defective motors. The basis of these claims is testimony by Larkin that the judge found unpersuasive and a few ambiguous documents. We cannot find clear error.

AFFIRMED.