The ORIGINAL GREAT AMERICAN CHOCOLATE CHIP COOKIE COMPANY, INCORPORATED, Plaintiff–Appellant,

v.

RIVER VALLEY COOKIES, LIMITED, Robert M. SIGEL, Paula Sigel, et al., Defendants–Appellees.

No. 91–3312.

United States Court of Appeals, Seventh Circuit.

Argued May 1, 1992.

Decided July 20, 1992.

Rehearing and Rehearing En Banc Denied Sept. 4, 1992.

Rene A. Torrado, Jr., Karen L. Pszanka–Layng, Charlotte M. Gibberman, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., John T. Marshall (argued), Carol E. Kirby, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for plaintiff-appellant.

Robert Boehm, Konstantinos Armiros (argued), Gary I. Blackman, Boehm & Pearlstein, Chicago, Ill., for defendants-appellees.

Before CUDAHY, POSNER, and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

This case arises from a squabble between a franchisor that we shall call the "Cookie Company" and the Sigels, who had a franchise to operate a Cookie Company store in a shopping mall in Aurora, Illinois. The company terminated the Sigels' franchise but they continued to sell cookies under the company's trademark, using batter purchased elsewhere after their supply of Cookie Company batter ran out. So the company sued them (and their corporate entity) to enjoin their violating the Trademark Act, 15 U.S.C. §§ 1051 *et seq.*, and moved for a preliminary injunction. The Sigels counterclaimed, charging that their franchise had been terminated in violation both of the franchise agreement and of the Illinois Franchise Disclosure Act, Ill.Rev. Stat. ch. 121½, ¶ 1719, and moving for a preliminary injunction directing the Cookie Company to restore their franchise. (Both parties had additional grounds for their motions, but these need not be discussed.) The district court granted the Sigels' motion and denied that of the Cookie Company, 773 F.S. 1123 (N.D.Ill.1991), which appeals under 28 U.S.C. § 1292(a)(1).

There is a question about our jurisdiction, characteristically unremarked by the parties. Rule 65(d) of the Federal Rules of Civil Procedure requires that "every order granting an injunction ... shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." The magistrate judge recommended that the district judge grant the Sigels' motion for a preliminary injunction, and he obliged. The magistrate judge's opinion contains no actual injunction order, however, and the judgment order entered at the direction of the district judge states in its entirety: "The Court adopts and incorporates Magistrate Judge Bucklo's Report and Recommendation pursuant to 28 U.S.C., SECTION 636(b)(1) as Appendix A to this Order." So there was no injunction order but merely an incorporation by reference of the draft of an injunction contained in the Sigels' motion. This fell far short of compliance with Rule 65(d). *Schmidt v. Lessard,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974) (per curiam).

A violation of Rule 65(d), as we explained in *Chicago & North Western Transportation Co. v. Railway Labor Executives' Association,* 908 F.2d 144, 149–50 (7th Cir.1990), does not deprive the appellate court of jurisdiction but can have jurisdictional consequences. An injunction that does not comply with the rule may not place the person "enjoined" under any le-

gal obligation, in which event he would lack the tangible stake in seeking to vacate it that Article III of the Constitution requires in any proceeding sought to be maintained in any federal court, including a court of appeals. An injunction that has no binding force at all simply cannot be appealed. *Bates v. Johnson,* 901 F.2d 1424, 1428 (7th Cir.1990).

Although a defective *permanent* injunction might be recharacterized as a declaratory judgment in order to preserve appellate jurisdiction, that route is not open here because we have a preliminary injunction and there is no appellate jurisdiction over preliminary declaratory judgments—assuming there is such a creature. Courts occasionally use the term as shorthand for the fact that a declaratory judgment is often a prelude to a request for coercive remedies. E.g., *Preferred Risk Ins. Co. v. Gill,* 30 Ohio St.3d 108, 112, 507 N.E.2d 1118, 1122 (1987). That irrelevant usage to one side, one case denies that there is such a thing as a preliminary declaratory judgment, *Sigel v. Salisbury,* 379 F.Supp. 317, 324 (W.D.Pa.1974), while other cases affirm its existence. *In re MCorp,* 101 B.R. 483, 485 (S.D.Tex.1989), vacated on other grounds under the name *MCorp Financial, Inc. v. Board of Governors,* 900 F.2d 852 (5th Cir.1990), aff'd and rev'd, —— U.S. ——, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991); *In re Public Service Co.,* 108 B.R. 854, 867 (Bankr.N.H.1989); *Pletz v. Secretary of State,* 125 Mich.App. 335, 372, 336 N.W.2d 789, 807 (1983). But the essential point is that no counterpart to 28 U.S.C. § 1292(a)(1) authorizes an appeal from a nonfinal declaratory judgment.

■ The acid test of whether a purported injunction is appealable is whether it is in sufficient though not exact compliance with Rule 65(d) that a violation could be punished by contempt or some other sanction. The test is satisfied. After the district judge entered his order adopting the magistrate judge's recommendation, the Cookie Company successfully moved for an order requiring the corporate defendant to post a $10,000 injunction bond. By making that motion the company acknowledged that it was enjoined; and it would be estopped to deny this should the Sigels, having posted the injunction bond, later move to enforce the injunction.

Moreover, the order granting the motion to require the posting of a bond states, "Parties to comply with contract," and terse as this command is we think it placed the company under a legal obligation enforceable by contempt or other sanctions should it violate the terms of the franchise agreement while the preliminary injunction was in force. The case is like *Schmidt v. Lessard, supra,* where the Supreme Court held that the district court's violation of Rule 65(d) had not deprived the Court of appellate jurisdiction. The judge had merely entered a judgment "in accordance with the Opinion," and the opinion had merely told the defendants "not to enforce 'the present Wisconsin scheme' [for involuntary commitment] against those in the appellees' class." 414 U.S. at 475–76, 94 S.Ct. at 715. It was a scandalously inadequate form of injunction. But it was not a nullity and it was therefore appealable.

■ The doctrine of pendent appellate jurisdiction furnishes an alternative ground for our appellate jurisdiction. *Asset Allocation & Management Co. v. Western Employers Ins. Co.,* 892 F.2d 566, 569 (7th Cir.1989); *Patterson v. Portch,* 853 F.2d 1399, 1403 (7th Cir.1988). The denial of the Cookie Company's motion for a preliminary injunction was unquestionably appealable under 28 U.S.C. § 1292(a)(1), and the grant of the Sigels' motion was the mirror image of that ruling.

■ We turn to the merits. In defense of their injunction the Sigels point out correctly that they didn't have to show that they would in fact prevail at trial—only that they had a sufficient likelihood of prevailing to warrant the issuance of an order that would avert the irreparable harm with which the termination of the franchise threatened them. The greater that harm, and the less the irreparable harm to the Cookie Company if the injunction were denied, the less of a showing the Sigels had to make that they had the better case on the merits. *Diginet, Inc. v. West-*

*ern Union ATS, Inc.,* 958 F.2d 1388, 1393 (7th Cir.1992), and cases cited there. So we ought to consider first whether the balance of irreparable harms is as one-sided in the Sigels' favor as the district court believed.

The Sigels used borrowed money to invest $125,000 to $130,000 in fixtures and other improvements. If the preliminary injunction is dissolved they will have to cease operating the store as a Cookie Company franchise and we may assume with them that their income from the store will as a result drop to zero. The Cookie Company has offered to let them assign the franchise, for a consideration that presumably would enable the Sigels to recover most, perhaps all, of their investment—or more, for that matter. But they claim not to have sufficient other income to make the payments required to service the loan until the assignment is complete, and they fear that in the interim the loan will be called and they will lose their home and the other assets that they pledged—two houses, and a retirement fund, of Mrs. Sigel's father— as collateral for it.

This is a wobbly footing for a finding of irreparable harm. The Cookie Company gave the Sigels an opportunity to assign the franchise back in August 1990, and again in October of that year (the suit was not brought until February 1991). They have only themselves to blame if they dallied in taking up either offer. Moreover, foreclosures are not instantaneous, so even if it takes the Sigels a while to find an assignee it is unlikely that they will lose the collateral for the loan in the interim.

To be balanced against this dubious showing of irreparable harm to the Sigels is the real though unquantified harm to the Cookie Company of being forced to continue doing business with a franchisee who not only committed rampant violations of the franchise agreement but also infringed the franchisor's trademarks. It is irreparable harm. The company cannot eliminate it by obtaining an award of damages from the Sigels, because no one supposes them capable of paying substantial damages. The harm may well exceed that of the Sigels should the injunction be vacated, un-less some special weight ought to be given to the fact that their personal as distinct from merely business assets are in jeopardy, an issue not discussed by the district court. This omission makes it difficult for us to understand the basis for the court's conclusion that the balance of harms favored the issuance of a preliminary injunction in the Sigels' favor.

Even if the court was right on that issue, there are two reasons to suppose that the Sigels had a somewhat heavier burden of demonstrating a solid likelihood of winning on the merits than in the usual case of one-sided irreparable harm. The first is that the injunction requires the parties to maintain a cooperative relationship for its duration by enjoining the Cookie Company "from failing and refusing to sell cookie batter, accessories and promotional items as needed and requested by defendants." Such an injunction imposes a continuing duty of supervision on the issuing court, and this can be a drain on scarce judicial resources. Courts should be, and generally are, reluctant to issue "regulatory" injunctions, that is, injunctions that constitute the issuing court an ad hoc regulatory agency to supervise the activities of the parties. *Marble Co. v. Ripley,* 77 U.S. (10 Wall.) 339, 358–59 19 L.Ed. 955 (1870); *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 391–92 (7th Cir. 1984); *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 134 n. 3 (5th Cir.1979); *Rodriguez v. VIA Metropolitan Transit System,* 802 F.2d 126, 132 (5th Cir.1986); *Bethlehem Engineering Export Co. v. Christie,* 105 F.2d 933, 935 (2d Cir. 1939) (L. Hand, J.); *Berliner Gramophone Co. v. Seaman,* 110 Fed. 30, 34 (4th Cir. 1901); Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2942, at pp. 375–76 (1973); cf. *McKnight v. General Motors Corp.,* 908 F.2d 104, 115 (7th Cir.1990). The reluctance is not total; there is no scarcity of elaborate regulatory decrees, particularly in civil rights suits against public institutions. *Spangler v. Pasadena City Board of Education,* 611 F.2d 1239, 1245 n. 5 (9th Cir.1979) (concurring opinion). Still, the cost (broadly conceived) of regulatory decrees to the judi-

ciary is a factor weighing against the grant of equitable relief in this case.

Second, although the Sigels tell us they have additional evidence, not presented at the preliminary injunction hearing, that they plan to introduce at trial, this is not a case in which the merits perforce are so undeveloped at the preliminary injunction stage that a one-sided showing of irreparable harm would warrant a preliminary injunction even if the moving party could demonstrate only a modest likelihood of victory at trial, so unreliable would the forecast of the outcome be. Most of the facts bearing on the parties' dispute in this case are uncontested and the issue is their proper legal characterization, for which (as we noted just the other day in *Central States, Southeast & Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1374 (7th Cir.1992)) no trial is necessary. It ought to be possible at this stage of the case to get a good fix on the merits.

If despite all we have said the Sigels could win this appeal even if they persuaded us that their chances of victory at trial were no better than 50–50, they would still lose, because their chances are, so far as we are able to judge, much worse. We discuss first whether the Sigels committed violations of the franchise that, under the agreement, entitled the Cookie Company to yank the franchise, and second whether the violations constituted "good cause" within the meaning of the Illinois Franchise Disclosure Act, which forbids the termination without good cause of a franchise before its expiration date.

The agreement defines "material breaches" to include, among other things, "failing to maintain and operate the Cookie System Facility in a good, clean, wholesome manner and in strict compliance with the standards then and from time to time prescribed by" the Cookie Company; selling any product not authorized by the Cookie Company; failing to pay any service fee within 10 days after it is due; failing to pay any of the company's invoices within that period; underreporting gross sales (on which the Cookie Company's royalty from its franchisees royalty is based) by 1 per-

cent or more; or failing to maintain certain insurance coverage. A material breach entitles the Cookie Company to terminate the franchise if the breach "is not totally remedied and cured within five (5) days after written notice of such event is sent to" the franchisee. Any three breaches, whether or not material, entitle the company to terminate the franchise within a 12–month period without giving the franchisee notice or an opportunity to cure.

The Sigels received the franchise in 1985. Between 1987 and the issuance of the preliminary injunction last year, they committed a number of material breaches. They repeatedly failed to furnish insurance certificates indicating that the Cookie Company was an additional insured on the Sigels' liability insurance policy. They paid four invoices (aggregating either $13,000 or $30,000—the record is unclear) more than 10 days after they were due, which meant more than 20 or more than 40 days after billing, because the agreement gave the Sigels either 10 or 30 days to pay their bills, depending on what kind of bill it was. (The average delay beyond the due date was either 28 days or 31 days; again the record is unclear.) They made five other late payments. Seven times they sent the Cookie Company checks that bounced. They flunked several inspections by the company's representatives, who found oozing cheesecake, undercooked and misshapen cookies, runny brownies, chewing gum stuck to counters, and ignorant and improperly dressed employees. An independent auditor found that in a three-year period the Sigels had underreported their gross sales by more than $40,000 (a nontrivial 2.8 percent of the total—almost three times the allowed margin of error); the result was to deprive the Cookie Company of almost $3,000 in royalties. After the company terminated the franchise, the Sigels pretended it was still in effect, refused to vacate the premises, and violated the franchise agreement by selling unauthorized products—cookies made with batter not supplied by the Cookie Company.

After most of these violations the company sent the Sigels a notice of default and the violations were then cured, though not

always within 5 days as required by the franchise agreement. The company relies on the alternative ground for termination—three or more violations within a 12–month period, a ground that does not require notice or an opportunity to cure. By the Sigels' own account, most of the violations occurred within an even shorter period in 1989 and 1990 when the store was being mismanaged by the person whom the Sigels (who live in St. Louis) had hired to run it.

The fact that the Cookie Company may, as the Sigels argue, have treated other franchisees more leniently is no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense to a speeding ticket. The fact particularly pressed by the Sigels that their violations may have been the fault not of the Sigels themselves but of their manager and that they ceased when the manager was replaced is similarly irrelevant. Liability for breach of contract is strict. *Patton v. Mid–Continent Systems, Inc.*, 841 F.2d 742, 750 (7th Cir.1988). It does not require proof of inexcusable neglect or deliberate wrongdoing. Even if it did, the Sigels would lose because the misconduct of a manager within the scope of his employment is attributed to the owner even in a negligence case. The case must be treated as if they had managed the store in person. We do not share the popular prejudice against absentee ownership but the Sigels cannot be allowed to obtain a legal advantage by virtue of being absentee owners.

The district court did not doubt that the Sigels had provided cause for the cancellation of their franchise under the terms of the contract. But it held that an Illinois court would not enforce those terms because they were "commercially unreasonable." Although the term, as we shall see, is not entirely foreign to the common law of Illinois, no state, as far as we know, recognizes commercial unreasonableness as a separate ground for refusing to enforce a contract. There are plenty of grounds for refusing to enforce contract terms (sometimes whole contracts), including fraud, duress, unconscionability, illegality, and pen-alty, but commercial unreasonableness is not one of them, though it may bear on some of them.

As for the Illinois Franchise Disclosure Act, it does not use the term commercial reasonableness or any synonym for it. It does require that a franchisor show good cause to terminate a franchise before its expiration; but "good cause" is a defined term which means, so far as relates to this case, either "the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days," or, "without the requirement of notice and an opportunity to cure, situations in which the franchisee ... repeatedly fails to comply with the lawful provisions of the franchise or other agreement." Ill.Rev.Stat. ch. 121½, ¶¶ 1719(b), (c)(4). We need not decide whether the five days that the franchise agreement allowed for the cure of defaults was unreasonably short. The company bases its right to cancel the agreement not on the Sigels' failure to cure their violations in timely fashion once they were brought to their attention but on the repeated violations within a 12–month period. The Sigels argue that committing a mere three violations, all that the agreement required to entitle the Cookie Company to terminate their franchise, does not necessarily equate to "repeatedly" failing to comply with the agreement. That is another question we need not decide. Even if the agreement violated the Franchise Disclosure Act by failing to specify some higher number, this would authorize the court, not to strike the entire provision, but only to restrict it to cases in which the franchisee's violations could fairly be described as repeated—and here it should be pointed that there is no 12–month limitation in the Act. If ever there was a case of "repeated" violations, it is this case.

That does not end our inquiry. Illinois like other states requires, as a matter of common law, that each party to a contract act with good faith, and some Illinois

cases say that the test for good faith "seems to center on a determination of commercial reasonability." *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 993, 81 Ill.Dec. 156, 171, 466 N.E.2d 958, 973 (1984); *Kawasaki Shop of Aurora, Inc. v. Kawasaki Motors Corp.*, 188 Ill.App.3d 664, 675, 136 Ill.Dec. 4, 10, 544 N.E.2d 457, 463 (1989); see also *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 714 n. 14 (7th Cir. 1985). The equation, tentative though it is ("seems to center on"), makes it sound as if, contrary to our earlier suggestion, the judges have carte blanche to declare contractual provisions negotiated by competent adults unreasonable and to refuse to enforce them. We understand the duty of good faith in contract law differently. There is no blanket duty of good faith; nor is reasonableness the test of good faith.

▆▆▆▆ Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper. That philosophy may animate the law of fiduciary obligations but parties to a contract are not each other's fiduciaries, *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 704–06 (7th Cir.1992); *Dyna–Tel, Inc. v. Lakewood Engineering & Mfg. Co.*, 946 F.2d 539, 543 (7th Cir.1991); *Market Street Associates Limited Partnership v. Frey*, 941 F.2d 588, 593–95 (7th Cir.1991); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990)—even if the contract is a franchise. *Murphy v. White Hen Pantry*, 691 F.2d 350, 354 (7th Cir.1982). Contract law imposes a duty, not to "be reasonable," but to avoid taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous. *Market Street Associates Limited Partnership v. Frey, supra*, 941 F.2d at 593–96. Suppose A hires B to paint his portrait to his satisfaction, and B paints it and A in fact is satisfied but says he is not in the hope of chivvying down the agreed-upon price because the portrait may be unsaleable to anyone else. This, as we noted in *Morin Building Products Co. v. Baystone Construction, Inc.*, 717 F.2d 413, 415 (7th Cir.

1983), would be bad faith, not because any provision of the contract was unreasonable and had to be reformed but because a provision had been invoked dishonestly to achieve a purpose contrary to that for which the contract had been made. The same would be true here, we may assume, if the Sigels had through their efforts built the Aurora cookie store into an immensely successful franchise and the Cookie Company had tried to appropriate the value they had created by canceling the franchise on a pretext: three (or four, or five, or for that matter a dozen) utterly trivial violations of the contract that the company would have overlooked but for its desire to take advantage of the Sigels' vulnerable position. *Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 136–37 (7th Cir.1990). This has not been shown. Not only were many of the violations not trivial, but there is no suggestion of exceptional performance by the Sigels. True, it was a new franchise, and it has been doing well ever since the incompetent manager was booted out; but it is in a prime location, and the company in negotiating the terms of the franchise rated it a "good" franchise—one very likely to do well.

▆▆▆▆ The value added by the Sigels is in any event irrelevant because the company did not attempt to take over the franchise. It offered to let the Sigels assign the franchise and keep the proceeds of the assignment, and it gave them enough time to do this, as we have seen, that they could have avoided financial embarrassment had they been willing to give up the franchise. So it is unlikely that the company was trying to appropriate any values created by the Sigels. At argument the Sigels' able counsel disclaimed any suggestion that the Cookie Company had behaved opportunistically; he ascribed the cancellation of their franchise to the spitefulness of an officer of the Cookie Company. The law generally and in this instance does not provide remedies for spiteful conduct or refuse enforcement of contractual provisions invoked out of personal nastiness. *Rideout v. Knox*, 148 Mass. 368, 19 N.E. 390 (1889) (Holmes, J.); cf. *Proimos v. Fair Automotive Repair*,

*Inc.,* 808 F.2d 1273, 1275 (7th Cir.1987). (Though a number of states do recognize liability in cases where out of pure spite a landowner builds a fence that blocks his neighbor's light or view. 1 Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, *The Law of Torts* § 1.26, at pp. 107–08 (2d ed. 1986); Stewart E. Sterk, "Neighbors in American Land Law," 87 *Colum.L.Rev.* 55, 62–63 (1987).) So penetrating an inquiry into personality would be beyond the realistic capacities of the courts in contract cases. The law does as we have emphasized provide a remedy in the name of good faith against opportunistic behavior, in the sense of behavior designed to change the bargain struck by the parties in favor of the opportunist; franchise statutes such as the Illinois Franchise Disclosure Act are also concerned with preventing opportunism. *Wright–Moore Corp. v. Ricoh Corp.,* 908 F.2d at 136–37. But so far at least, the Sigels have not presented any evidence of such behavior on the part of the Cookie Company.

The term "commercial reasonableness" has cropped up in a few Illinois cases in connection with unconscionability. *Reuben H. Donnelley Corp. v. Krasny Supply Co.,* 227 Ill.App.3d 414, 420, 169 Ill.Dec. 521, 525, 592 N.E.2d 8 (1991); *Anders v. Mobil Chemical Co.,* 201 Ill.App.3d 1088, 1097, 147 Ill.Dec. 779, 784, 559 N.E.2d 1119, 1124 (1990); *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 989–90, 42 Ill.Dec. 25, 32, 408 N.E.2d 403, 410 (1980). But they give the term a restricted meaning. The doctrine of unconscionability, closely allied as it is to fraud and duress, is designed to prevent overreaching at the contract-formation stage. The presence of a commercially unreasonable term, in the sense of a term that no one in his right mind would have agreed to, can be relevant to drawing an inference of unconscionability but cannot be equated to it. *Lincoln Cardinal Partners v. Barrick,* 218 Ill.App.3d 473, 478, 161 Ill.Dec. 189, 193, 578 N.E.2d 316, 320 (1991); *Amoco Oil Co. v. Ashcraft,* 791 F.2d 519, 522 (7th Cir.1986). We do not understand the Sigels to be arguing that when they were negotiating for the franchise the Cookie Company took advantage of their ignorance or desperation to force unreasonable terms upon them. The Sigels are not vulnerable consumers or helpless workers. They are business people who bought a franchise (actually two, though the other isn't in issue in this case) in another state as an investment to be managed by local managers. They were not forced to swallow unpalatable terms. They have rightly declined even to argue unconscionability.

■■■ The preliminary injunction should have been denied for the additional reason that the Sigels had infringed the Cookie Company's trademarks, in violation of the Trademark Act. (The Sigels do not, and cannot, *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374–75, 376, 377–78 (3d Cir.1992), deny the violation.) Unclean hands is a traditional defense to an action for equitable relief. The purpose is to discourage unlawful activity, and is as relevant to preliminary as to final relief. *Shondel v. McDermott,* 775 F.2d 859, 868 (7th Cir.1985). It is true that a modern chancellor unlike his medieval forbears does not have uncabined discretion to punish moral shortcomings by withholding equitable relief. *Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 193 (7th Cir.1985); *Proimos v. Fair Automotive Repair, Inc., supra,* 808 F.2d at 1275. Modern equity is a system of entitlements. But equitable relief is costly to the judicial system, especially in a case such as this where the relief sought would cast the court in a continuing supervisory role. It would make no sense to incur that cost on behalf of someone who was trying to defraud the person against whom he was seeking the court's assistance. "One who has defrauded his adversary to his injury in the subject matter of the action will not be heard to assert a right in equity." *Fruhling v. County of Champaign,* 95 Ill.App.3d 409, 417, 51 Ill.Dec. 508, 513, 420 N.E.2d 1066, 1071 (1981), quoted in *Polk Bros.,*

*Inc. v. Forest City Enterprises, Inc., supra,* 776 F.2d at 193; see also *id.* at 194.

The Sigels argue that they had no choice but to infringe the Cookie Company's trademarks surreptitiously, because, had they stopped selling cookies under the company's trademarks after the company stopped shipping batter to them, they would have been forced to default on their promissory note. They are wrong. They had a choice. They could have sued the company for breach of contract and violation of the disclosure law and moved for a preliminary injunction in that action. Instead of following that route, the open and honorable one, they infringed the company's trademarks covertly and did not move for an injunction until they were discovered and sued for infringement. They should not be rewarded with a preliminary injunction for their putting their franchisor to the expense of suing them for trademark infringement. Although, as we explained in *Polk Bros.,* the course of decisions in Illinois (it is Illinois' version of the doctrine of unclean hands that we must apply in this diversity case) has not run entirely true, 776 F.2d at 194, we think an Illinois court would deny an injunction to a firm that by its fraudulent conduct had precipitated the very suit in which it was seeking the injunction. "If the plaintiff creates or contributes to the situation on which it relies, the court denies equitable relief in order to deter the wrongful conduct." *Id.* at 193.

In pooh-poohing their misconduct the Sigels place too much weight on our decision in *Lippo.* That decision held that the particular franchise agreement, which did not have the same terms as the one here, made the sale of misbranded product a curable violation. The decision, interpreted narrowly in *Beermart, Inc. v. Stroh Brewery Co.,* 804 F.2d 409, 412 (7th Cir.1986), should not be understood to stand for the broader proposition that trademark infringement by a franchisee is a trivial offense that should never entitle the franchisor to cancel the franchise, or for the still broader proposition that in a dispute between franchisee and franchisor the judicial thumb should be on the franchisee's pan of the balance. All other objections to one side (for example, the judicial oath, which, echoing Deuterono-

my, requires judges to judge "without respect to persons"), such a tilt is hardly likely to help franchisees as a group. James A. Brickley, Federick H. Dark & Michael S. Weisbach, "The Economic Effects of Franchise Termination Laws," 34 *J. Law & Econ.* 101 (1991). The more difficult it is to cancel a franchise, the higher the price that franchisors will charge for franchises. So in the end the franchisees will pay for judicial liberality and everyone will pay for the loss of legal certainty that ensues when legal principles are bent however futilely to redistributive ends.

The idea that favoring one side or the other in a class of contract disputes can redistribute wealth is one of the most persistent illusions of judicial power. It comes from failing to consider the full consequences of legal decisions. Courts deciding contract cases cannot durably shift the balance of advantages to the weaker side of the market; they can only make contracts more costly to that side in the future, because franchisors will demand compensation for bearing onerous terms. *Amoco Oil Co. v. Ashcraft, supra,* 791 F.2d at 522.

The Cookie Company appealed not only from the grant of the Sigels' motion for a preliminary injunction but also from the denial of its motion for a preliminary injunction against the Sigels' violation of its trademarks. To this part of the company's appeal the Sigels do not deign to reply. We take this to be a concession that they have no defense to the motion. The Cookie Company is entitled to the injunction that it sought, and we remand for its entry.

REVERSED AND REMANDED, WITH DIRECTIONS.

CUDAHY, Circuit Judge, dissenting.

The majority opinion is notable for one thing at least: it fails throughout even to mention that the district court has broad discretion to issue or deny a preliminary injunction. *Hoosier Penn Oil Co. v. Ashland Oil Co.,* 934 F.2d 882, 884–85 (7th Cir.1991). Our review, intended to be deferential, has become in this case plenary, and its tone suggests a detailed and certain

knowledge of the equities which I think is wholly lacking at this level of review. The fact is that a respected magistrate judge examined the elements of this controversy in painstaking detail and her work was approved after a *de novo* review by a conscientious district judge. Close as they are to the events and the actors, it ill behooves us to brush aside their efforts with hardly a passing nod. Nor does their invocation of "commercial reasonableness" seem to me in any way out of step with Illinois law. *See, e.g., Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 81 Ill.Dec. 156, 171, 466 N.E.2d 958, 973 (1984) (observing that "the test used by most courts in defining good cause [to terminate a franchise agreement] seems to center on a determination of commercial reasonability").

I find the majority's discussion of the balance of harms highly implausible. The majority's decision puts the Sigels out of business. The majority speculates that the Sigels will be able to salvage something economically, but this is *only* speculation. The decision of the district court, on the other hand, would merely have preserved the status quo pending full consideration of the merits. It seems to me obvious—painfully so—that the Sigels have far more to lose than does the Cookie Company.

The majority's review of the facts here is so lopsided as to be almost droll—if it were not serious business. For example, the majority states that the Sigels "flunked several inspections by the company's representatives." *Ante* at 278. But the Sigels were never informed that their operation of their franchise fell so far below acceptable standards of cleanliness and quality as to constitute an event of default. In fact, the magistrate judge found no evidence that the Sigels even knew what constituted a passing (or failing) grade on such an inspection. The magistrate judge's detailed probing of all these points is considerably more balanced and fair than that of the majority.

The discussion of the Illinois Franchise Disclosure Act is equally one-sided. Illinois did not enact this law because it thought franchisors were being abused by their franchisees, as the majority seems to believe. Apparently, the legislators had not read enough scholarly musings to realize that any efforts to protect the weak against the strong would, through the exhilarating alchemy of economic theory, increase rather than diminish the burden upon the powerless. I agree that the thumb of judges ought not be placed on the scales of justice. But judges have no obligation to ignore the numerous thumbs already put down on the side of economic power, nor the thumb of the legislature on the other side.

Finally, while I do not in principle approve the use of "counterfeit" cookie batter, I would not single this out as a leading social evil of our time. As a matter of fact, the majority makes considerably more fuss about it than does the Cookie Company. Apparently, the batter used by the Sigels was of unquestioned quality, and they turned to it in desperation when they were cut off from their contract source.

I would affirm the judgment of the district court and I respectfully dissent.