BJM & ASSOCIATES, INC., and Barbara
Jane Moores, Plaintiffs,

v.

NORRELL SERVICES, INC., Defendant.

Civ. A. No. 92–079.

United States District Court,
E.D. Kentucky,
Lexington.

May 3, 1994.

Michael W. Troutman, E. Patrick Moores, Fowler, Measle & Bell, C. Gibson Downing, Downing & Willmott, Lexington, KY, for plaintiffs.

James R. Odell, Lexington, KY, John G. Parker, Melinda L. Moseley, Paul, Hastings, Janofsky & Walker, William J. Holley, II, Parker, Hudson, Rainer & Dobbs, Atlanta, GA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FORESTER, Judge.

### I. INTRODUCTION

Plaintiffs, BJM & Associates, Inc. ("BJM"), and Barbara Jane Moores filed this declaratory judgment action against Defendant, Norrell Services, Inc. ("Norrell"), for a determination of the parties' respective rights under a License Agreement ("the Agreement") that the parties entered into on July 15, 1977. The Agreement was renewed most recently in 1987 and will expire on its own terms in 1997.

Initially, BJM alleged that Norrell had discriminated against it by not allowing it to participate in a Bonus Commission Program that Norrell devised for some of its franchisees in April 1991, resulting in an alleged loss of profits and a lower profit margin to BJM. BJM also alleged that Norrell had breached the Agreement in the following respects: (1) by failing to provide assistance to it in the development of sales and promotional programs and by failing to provide direct mail advertising, including at least four direct mailings per year, all in violation of Paragraph 19 of the Agreement; (2) by providing more support and services to its other franchisees than to BJM, in violation of Paragraph 6 of the Agreement; (3) by operating or planning to operate a similar type business (i.e., Norrell's Management Services business), within BJM's protected area, in violation of Paragraph 8 of the Agreement; (4) by forcing BJM to purchase an expensive computer system which had the effect of shifting the responsibility for performing bookkeeping services from Norrell to BJM, in violation of Paragraph 21 of the Agreement; (5) by arbitrarily increasing the reserve for bad debts from 3% to 5%, in violation of Paragraph 24 of the Agreement; and (6) by refusing to provide to BJM an accounting for the workers' compensation insurance Norrell provided to BJM's temporary employees under Paragraphs 11(b) and 23 of the Agreement. Subsequently, BJM was granted leave to file an Amended Complaint to assert claims for breach of fiduciary duty and for anticipatory breach of contract.

BJM seeks rescission of the Agreement by reason of Norrell's alleged violations of the Agreement and Norrell's alleged lack of good faith in dealing with BJM.

Norrell filed a counterclaim against BJM, alleging that from July 1988 to July 1992, BJM failed to pay the required liquidation fees to it in violation of the Agreement, which Norrell contended was a material breach of the Agreement. As a result of this alleged violation, Norrell seeks a determination that (1) the Agreement is terminated pursuant to Paragraph 44 of the Agreement, (2) the buy-out provision contained in Paragraph 46 cannot be exercised, and (3) the non-competition provisions of the Agreement are enforceable. Norrell also claimed that over a five-year period from 1987 to 1992, BJM had conducted "off-the-books" business by not reporting to Norrell all of the income BJM had earned under the Agreement.

The parties' claims against each other were tried intermittently to the Court in a bench trial over the course of fifteen days. Trial was held on March 31, April 1, 6, 19–22, May 3–6, June 22–24 and 30, 1993.

This matter is before the Court for entry of Findings of Fact and Conclusions of Law. Having considered the evidence introduced at trial, the parties' proposed Findings of Fact and Conclusions of Law, the parties' extensive post-trial briefs, and applicable case law, the Court hereby makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

Plaintiff BJM, an employment agency, is wholly owned and operated by Plaintiff Barbara Jane Moores, who has been in the employment agency business in central Kentucky for the past twenty-two (22) years. Ms. Moores was employed by Job Guidance of Kentucky, a permanent placement agency, in December 1972. In 1974, Ms. Moores purchased Job Guidance of Kentucky, and was successfully operating Job Guidance of Kentucky in 1976 when Norrell, a franchisor in the temporary employment business in Atlanta, Georgia, contacted Ms. Moores to see if she would have any interest in becoming a licensee of Norrell. After Ms. Moores went to Atlanta to meet with Norrell's officers and to see the Norrell operation, she decided to become a Norrell licensee. (Moores, Tr. 3–31–93, pp. 3–12).

For more than thirty (30) years, Norrell, a Georgia corporation, has successfully operated a temporary employment business. Norrell refers to the method of operating its business as the "Norrell System." With the establishment of branch offices, franchisees, and licensees, Norrell has expanded its business throughout the United States.

As a Norrell licensee, BJM is in the business of providing employees to clients that are in need of employees from time to time on a temporary basis. However, after becoming a Norrell licensee, Ms. Moores also continued to successfully operate her permanent employment agency, Job Guidance of Kentucky, which she owned and operated prior to becoming a Norrell licensee.

On July 15, 1977, BJM and Norrell entered into the Agreement (PX 1) wherein BJM became a licensee[1] of Norrell, agreeing to operate the employment agency under the Norrell System, in exchange for a 50/50 split of profits and losses. Norrell drafted the Agreement, which is governed by the law of Georgia.

### A. The Bonus Commission Program

The majority of Norrell's franchisees share profits and losses with Norrell on a 40/60 split.[2] Under this division of profits and losses, the franchisee receives forty percent (40%) of the Gross Margin dollars earned, and Norrell receives the remaining sixty percent (60%) of such dollars. In April 1991, due to the national economic recession, Norrell implemented a short-term Bonus Commission Program that was to be in effect for the remainder of 1991 for the franchisees operating under the 40/60 split of Gross Margin dollars. (Obermeyer, 5–4–93, pp. 10–11; Williams, 5–5–93, pp. 3–4). Norrell did not permit any of its franchisees that had a split of profits higher than 40/60, such as 50/50, 60/40, or 70/30, to participate in this Bonus Commission Program. (Williams, 5–5–93, pp. 4–5).

Under the Bonus Commission Program, from April to December 1991, the 40/60 franchisees received a 60/40 split of the total average weekly Gross Margin dollars that exceeded the franchisee's "base" of business. The "base" was the total average weekly

---

1. While BJM is classified as a licensee in the Agreement, throughout this litigation the parties have used the terms "licensee" and "franchisee" interchangeably, observing no distinction between the two terms. The Court shall likewise use these two terms interchangeably. At time of trial, Norrell had four "licensees" and more than eighty "franchisees."

2. The majority of Norrell's franchisees divide profits with Norrell on a 40/60 basis; however, four of Norrell's older franchisees operate under a profit split more favorable to the franchisee. The franchisees in Orlando, Florida and Tampa, Florida are on a 60/40 split, the franchisee in New Orleans, Louisiana is on a 70/30 split, and BJM is on a 50/50 split. (Obermeyer, Tr. 5–5–93, pp. 72–75).

Gross Margin dollars the franchisee earned during January, February, and March 1991. The 60/40 split did not apply to the franchisee's business base; it applied only to those Gross Margin dollars earned above the business base. Thus, for the last three quarters of 1991, the 40/60 franchisee divided its business base with Norrell on a 40/60 split, just as it would have done before the implementation of the Bonus Commission Program, and divided its total average weekly Gross Margin dollars earned above the business base on a 60/40 split.

Norrell did not permit BJM, which was under a 50/50 split of Gross Margin dollars with Norrell, or any other franchisee that was operating under a split greater than 40/60, to participate in the Bonus Commission Program. (Obermeyer, 5–4–93, pp. 14–15; License Agreement, Para. 23; DX 10, 11, 13; Moores, 4–6–93, pp. 203–204). Since BJM was on a 50/50 profit split with Norrell, BJM's share of Gross Margin dollars was 10% greater than the franchisees dividing their profits on a 40/60 split with Norrell; therefore, BJM was not similarly situated with the 40/60 franchisees. These undisputed facts do not support BJM's claim that Norrell discriminated against it by not permitting it to participate in the Bonus Commission Program.

BJM also claimed that Norrell financially supported the Bonus Commission Program by withdrawing support services, such as advertising, to it and all other franchisees, in violation of the Agreement. In support of this claim, BJM relies on a memorandum dated April 19, 1991 from Eugene Obermeyer, the president of Norrell's Franchise Division, to all franchisees which explains the mechanics of the Bonus Commission Program. In this memorandum, Mr. Obermeyer states:

> We concluded that certain support services could be delayed or interrupted with the savings made available to partially support this bonus. Specifically, it was the conclusion of the Franchise Advisory Board that resources to support franchisees in areas such as National Accounts

and Marketing Programs could be reduced.

PX 66.

BJM's claim that Norrell ceased providing support services, in violation of the Agreement, in order to support the Bonus Commission Program is refuted by Eugene Obermeyer, who testified that Norrell's decision to delay its planned advertising campaign for 1991 due to the national economic recession was made prior to Norrell's decision to implement the Bonus Commission Program. (Obermeyer, 5–4–93, pp. 33–34). The Court finds Eugene Obermeyer's testimony to be credible on this point. The record does not support BJM's claim that Norrell ceased providing support services to its franchisees in order to support the Bonus Commission Program.

B. *The License Agreement*

1. *Direct mailings*

BJM claimed that Norrell had violated Paragraph 19 of the Agreement by failing to provide assistance to it in the development of sales and promotional programs and by failing to provide direct mail advertising, including at least four direct mailings per year. Paragraph 19 states:

> 19. *Promotional Assistance of Norrell.* Norrell agrees to cooperate with the Licensee in the development of sales and promotional programs.
>
> Norrell agrees to direct the Licensee in the development of a list of prospective customers. However, the primary responsibility of actually compiling said list shall be that of the Licensee. Norrell agrees to set up and maintain said direct mail list up to but not exceeding what Norrell deems to be a reasonable number of names. Norrell further agrees to provide direct mail advertising for prospective customers and to pay for at least four (4) mailings per year to Licensee's mailing list as maintained by Norrell.

PX 1.

The testimony of Barbara Jane Moores and Eugene Obermeyer established that Norrell provided the direct mailings to BJM it was required to provide under the Agree-

ment until 1990. (Moores, Tr. 4–21–93, pp. 137–140; Obermeyer, 5–4–93, pp. 23–25). However, in 1990, Norrell terminated its direct mail program and shifted its advertising focus to print and national radio advertising. Obermeyer, 5–6–93, pp. 130–140). In 1992, Norrell shifted from print and national radio advertising to "franchisee-controlled marketing," which had the effect of shifting the responsibility for advertising from Norrell to BJM. In 1992, Norrell also provided BJM with a direct mail kit and a "Marketing Toolbox" so that BJM could conduct its own local direct mail campaign. (Moores, 4–20–93, pp. 166–167; Obermeyer, 5–4–93, pp. 26–27; PX 43).

It is undisputed that in 1990 Norrell stopped providing the four direct mailings to BJM it was required to provide under Paragraph 19 of the Agreement. Norrell argues that while it ceased to provide the four direct mailings per year to BJM, as required by the Agreement, it has nonetheless "substantially complied" with the Agreement because it continued to provide advertising services, first in the form of print and national radio advertising and then more recently by providing BJM with a "Marketing Toolbox" that will enable BJM to provide its own local direct mail campaign.

The Court finds no merit in Norrell's "substantial compliance" argument. In making the transition from the four direct mailings per year it was contractually obligated to provide BJM to print and national radio advertising and then to "franchisee-controlled marketing," Norrell shifted this advertising cost to BJM, contrary to the Agreement.

Under Norrell's current advertising scheme, BJM is now responsible for its own advertising, including the cost of printing, preparing, mailing and monitoring its local direct mail advertising, in violation of the Agreement. It is clear that the elimination of the four direct mailings Norrell was obligated to provide to BJM under the Agreement at Norrell's own cost is a material breach of the Agreement.

### 2. *"Management Services" redefined*

One of the principal issues in this case concerns the concept of Management Services and whether Norrell's redefinition of Management Services in 1992 violates Paragraph 8 of the Agreement, which states:

> 8. *Protected Area.* Norrell agrees that during the term of this Agreement it will not itself operate or license another person or persons to operate under the trade names "Norrell", "Norrell Services" or "Norrell Temporary Services", or any derivative thereof, any similar type business to that which is to be conducted by the Licensee within the protected area. The protected area shall be as follows: The following counties in Kentucky: Fayette, Bourbon, Clark, Jessamine, Scott, Woodford, Franklin, and Madison.

PX 1.

In describing the "Spectrum of Services" offered by its franchisees in 1991, Norrell defined Management Services as "Responsibility for managing people, function, productivity, quality of the department." (PX 49). [See Fig. 1.].

**Fig. 1 -- Norrell's Spectrum of Services circa 1991**

In the late 1970s, Norrell viewed Management Services as an enhanced package of services that would be offered through its franchisees. (Moores, Tr. 3–31–93, pp. 74–98).

In the early 1980s, BJM provided and serviced the entire people, functions, and productivity of the mail room, data center, cafeteria and paint shop at Clark Equipment Company. BJM had on-site supervisors in these departments and staffed the entire labor force of these departments.

In the mid–1980s, BJM assumed and presently has responsibility for providing and servicing the entire people, function, and productivity of several departments, such as the mail room, data center, and assessment center, at the Toyota Motor Manufacturing plant in Georgetown, Kentucky. At the assessment center, which is operated off-site from the Toyota plant, BJM is in charge of receiving all applications made through the Kentucky Human Resources Cabinet for employment at Toyota. BJM processes and screens these applications, determines which applicants qualify for initial testing and interviews, and conducts those tests and interviews. BJM then conducts additional rounds of tests and follow-up interviews of the applicants and determines which applicants quali-

fy for final interviews with Toyota management.

Based on Norrell's 1991 definition of Management Services, BJM proved that the services it has provided to Clark Equipment and presently provides to Toyota meet the definition of Management Services. During the time BJM has been a Norrell licensee, BJM has sold services in all categories, including Management Services, identified in Norrell's 1991 "Spectrum of Services" [Fig. 1.]. BJM also has provided Management Services similar to that it provides Toyota to the following other clients in the protected area: Johnson Controls, FMC, American Express, and Clin-Trials, as explained in detail below:

At Johnson Controls, BJM supervises temporary employees from other employment services, evaluates the performance of these employees and the other employment services, and reports to the plant manager. (Moores, Tr. 4–21–93, pp. 8–13). For FMC, BJM oversaw the operations of three warehouses and was responsible for staffing the cafeteria and medical departments (Moores, Tr. 4–21–93, pp. 5–8). For American Express BJM performs the following services:

(i) in the travel-related services division, BJM is responsible for the entire operation

of the office, which coordinates all travel arrangements for IBM accounts whose employees are traveling into, out of, or through Lexington. BJM assisted American Express in selecting the site for this office and presently manages 100% of the function of this office. The nearest supervisory personnel American Express has to this office is in Orlando, Florida. (Moores, Tr. 4–21–93, pp. 19–20; Staples, Tr. 5–4–93, pp. 11–13).

(ii) in the Shearson Lehman Brothers division of American Express, BJM is preparing to assume the function of the destruction of old records for this division. (Staples, Tr. 5–4–93; pp. 11–13).

For ClinTrials, BJM receives and processes approximately 100,000 forms from fifty-two different sites throughout the United States. BJM employs programmers at the site; these employees key in data from the forms; the data are analyzed by a BJM employee for quality and then analyzed again for patterns regarding medicine dosages, addiction rates, and other factors. Thereafter, the data are sent to a technical writing section. BJM has submitted a proposal to Clin-Trials to staff the entire technical area at ClinTrials. BJM employs 18–25 people at the site, including a lead supervisor who reports directly to a staff person in the BJM office. (Staples, Tr. 5–4–93, pp. 8–10).

Another one of BJM's clients is National City Bank. At one time, BJM had total responsibility for the bank's collections area; however, this function has recently been moved to one of the bank's regional processing centers. BJM continues to handle the bank's entire summer teller program. (Staples, Tr. 5–4–93, pp. 17–18).

Based on the expertise of Ms. Moores, who has been in the employment agency business since 1974, the Court finds that BJM is fully capable of providing Management Services, as defined by Norrell in 1991, and that BJM has provided such services to several clients in its protected area. BJM's sales manager since 1989, Jeff Staples, is also experienced in the sale of Management Services. Prior to working for BJM, Mr. Staples was employed by American Building Maintenance, a management services firm, and he has also been employed by a Western Temporary

Services franchisee in Louisiana that sold staffing and outsourcing services. (Staples, Tr. 5–4–93, pp. 1–5). This finding is not to say that all Norrell franchisees are capable of providing Management Services; however, due to the expertise of Ms. Moores, BJM has provided Management Services and remains capable of providing Management Services today.

Norrell's "Spectrum of Services" [Fig. 1.] also includes the term "outsourcing," indicating that it is broad enough to include both "Master Vendor Parterning" and "Management Services." Norrell's definition of "outsourcing" is found in a document entitled "Outsourcing—Contract Services" (PX 45) that was distributed to the franchisees at the annual meeting on November 30—December 1, 1990, to train the franchisees on the type of presentation to make to sell outsourcing and contract services to prospective business customers. Page 3 of PX 45 defines "outsourcing," explaining that "[w]e become responsible for the people and training necessary to perform the function at a contracted productivity level for an agreed to cost." Page 2 of PX 45 states that foodservice, security, and cleaning functions are services that have commonly been "outsourced" and that today "outsourcing" also includes the following: data entry, text processing, message centers, receptionists, word processing, mail room, copy centers, administration clerks, telemarketing, and warehouse.

Based on Norrell's definition of "outsourcing" found in PX 45, the Court finds that BJM also proved at trial that it had provided "outsourcing" services to Johnson Controls, FMC, American Express, ClinTrials, and National City Bank.

Prior to 1992, Norrell encouraged its franchisees, including BJM, to sell the types of services that Norrell presently claims can only be marketed by Tascor, its wholly-owned subsidiary. This finding is based on the following evidence:

1. A 1990 Norrell sales brochure entitled "Management Solutions for the 1990s" concerned the marketing of Data Services and also described the other services available through Norrell, stating that on-site manage-

ment services could be provided by its franchisees.  PX 53.

2.  A memorandum from Guy Millner, Norrell's Chairman of the Board and CEO, dated April 26, 1991, to all franchisees noted that "our outsourcing focus is beginning to really pay dividends.  We expect 'outsourcing' (we called it staffing in the 70's and 80's) to be a major part of our company in the 90's.  This is the best opportunity we have had in the last five years to sell staffing—to really grow market share."  PX 70.

3.  A memorandum from Russell J. Baker, a Norrell Regional Sales Manager, dated May 7, 1991, to the North Central franchisees, which included BJM, encouraged these franchisees to sell contract services, stating:

> This is expected to be one of the fastest growing areas of our business during the 90's.  While the 'temporary help' business will probably grow at a slower rate and become more competitive than during the 80's, more and more companies are expected to begin utilizing 'contract services' to become more cost efficient and effective.

PX 46.

4.  Norrell's 1991 Annual Report contains a forward to all shareholders from Guy Millner, the Chairman and CEO, which makes the following statements about Management Services:

> Norrell offers a cost-saving alternative to staffing support departments with full-time personnel.  Our on-site management service will take complete responsibility for support functions—from hiring and training ... to day-to-day supervision and payroll.
>
> .     .     .     .     .
>
> The concept is not new.  For years, businesses have found it is effective and economical to contract for many routine services such as maintenance, food service, and security.  Today, however, because of the need to cut costs, operate 'leaner', or even quickly implement new or larger systems, the trend to management services is

expanding—with Norrell taking a leading role.

PX 159, p. 2.

The 1991 Norrell Annual Report also makes the following statements about its franchisees, touting their ability to provide Management Services:

> Our clients want more flexibility in dealing with today's demanding marketplace.  Our Franchise offices are now positioned to better meet their needs by offering a spectrum of services with more flexible pricing from filling a vacancy to staffing entire functions to managing facilities for our clients.

Id. at p. 3.

Subsequently, in 1992, Norrell did an about-face, redefined Management Services, concluded that its franchisees were not capable of providing Management Services, and formed Tascor, Inc., a subsidiary wholly-owned by Norrell, for the purpose of marketing its Management Services.  This subsidiary was initially formed on October 21, 1991, under the name of Norrell Contract Services, Inc.; however, on January 10, 1992, the name was changed to Tascor, Inc.  PX 116.

On May 8, 1992, Doug Miller sent a memorandum to all franchisees advising them that Norrell had entered into a joint venture with IBM concerning the offering of Management Services and that more detailed information on this joint venture would be forthcoming.  Thereafter, on May 12, 1992, Ed Nubel, Norrell's marketing director, distributed to all franchisees a copy of an article from the Business Section of the *Atlanta Journal* on May 9, 1992.  The article stated that Norrell had entered into a joint venture with IBM to provide temporary workers to IBM through a new Norrell subsidiary, which would supply temporary switchboard operators, copy personnel, and security personnel.  PX 92.  Ms. Moores perceived the formation of this Norrell–IBM joint venture as a threat to BJM's business because BJM was already providing employees to fill the same type positions that were being filled by Tascor, Norrell's new subsidiary.  (Moores, Tr. 4–6–93, pp. 13–19).

Norrell formally released information to its franchisees concerning Tascor in a memoran-

dum dated August 27, 1992, to all franchisees from Gene Obermeyer. In this memorandum, Mr. Obermeyer attempts to address some of the questions raised by the formation of Tascor and to reassure the franchisees that "Norrell is committed to growing its core business—the temporary help business—and that we feel the new business offers tremendous opportunities for mutual benefit between both temporary services and management services." PX 96. Mr. Obermeyer then proceeds to distinguish Management Services from Norrell's traditional temporary services, as seen below:

> Before I explain how you will benefit from this new venture, let me take a moment to explain the distinct services each company provides:
>
> ★ Management Services is defined as a business of managing and performing all or part of a client's business activity or functions in which they as the service provider are responsible for the function or activity and for the results of such function or activity.
>
> ★ Norrell Services provides traditional temporary services including vacancy fill-in, project and peak period staffing, on-site management of a client's total temporary needs (Master Vendor Program), and staffing which may include on-site supervision of our employees at the client's site but without responsibili-

ties for the function and the results of the functions we are staffing.

PX 96, p. 1.

Mr. Obermeyer then advises the franchisees that "the management services business will benefit you in a number of ways," and that he has "asked Legal to prepare an agreement containing the appropriate language and terms." *Id.* at p. 2. Shortly after receiving Mr. Obermeyer's memorandum (PX 96), Ms. Moores received a copy of the proposed Tascor agreement. PX 98. A final draft of the Tascor Agreement was sent to Ms. Moores on January 29, 1993, by Charles Gibbons, Norrell's President and Chief Operating Officer. His cover letter to Ms. Moores states, in pertinent part:

> Please read the enclosed agreement carefully. If you have any questions, please call either Gene Obermeyer or myself. Signing this agreement will be a requirement for your participation with us in this opportunity.

PX 117. Upon review of the Tascor agreement, Ms. Moores decided not to execute this agreement because based on her perceptions about Tascor, she concluded that entering into the Tascor agreement would limit the services she could offer and would require her to relinquish her protected market. (Moores, Tr. 4–6–93, pp. 62–69).

In 1992, after the formation of Tascor, Norrell introduced a chart showing how it had redefined its "Spectrum of Services." PX 125. [See Fig. 2.].

NORRELL'S SPECTRUM OF SERVICES

THE PARTNERING RELATIONSHIP

STRATEGIC

TACTICAL

| Temporary Services | Project & Peak Period Staffing | Long Term & Contract Staffing | Master Vendor Partnering | Management Services |

NORRELL'S LEVEL OF RESPONSIBILITY

*Fig. 2 – Norrell's "new official' Spectrum of Services circa 1992*

Norrell's new version of its "Spectrum of Services" depicts a physical split between those services that franchisees may provide and Management Services. Norrell's revised "Spectrum of Services" is included in its 1992 Annual Report, which describes these services. Concerning Management Services, the 1992 Annual Report states:

> **Management Services.** The Tascor subsidiary of Norrell is taking a leading role in offering innovative cost-saving alternatives to staffing traditional office support departments with full-time personnel. Tascor assumes complete responsibility for business support services, including productivity and final output.

PX 139, p. 3.

In describing how Tascor does business, this Annual Report stated:

> The scope of Tascor's services includes taking total responsibility for such areas as administrative and secretarial support, mail services, reprographics, shipping and receiving, graphics, travel management, accounts payable, asset management, data entry, telecommunications, telemarketing, facility management, recruiting, out-placement, skills training and education.

*Id.* at p. 5.

Norrell's 1992 Annual Report is prefaced with a message from its Chairman and CEO, Guy Millner, who informs the shareholders of the formation of Tascor, "which will focus on the recent phenomenon of administrative outsourcing and the related alliance with IBM to assist them in their downsizing." *Id.* at p. 2. Mr. Millner's characterization of outsourcing in the 1992 Annual Report as a "recent phenomenon" is contrary to and inconsistent with Norrell's previous descriptions of outsourcing. For example, at the annual meeting in 1990 where Norrell instructed the franchisees on the type of presentation to make to sell outsourcing, Norrell stated that outsourcing included such services as data entry, text processing, message centers, receptionists, word processing, mail room, copy centers, administration clerks, telemarketing, and warehouse. PX 45. Additionally, in April 1991, Mr. Millner informed the franchisees that "our outsourcing focus is beginning to really pay dividends. We expect 'outsourcing' (we called it staffing in the 70's and 80's) to be a major part of our company in the 90's. This is the best opportunity we have had in the last five years to sell staff-

ing—to really grow market share." PX 70. Based on this evidence, the Court finds that Norrell has also changed its definition of outsourcing and that Norrell intends for such outsourcing services to be offered only by Tascor and not by its franchisees, such as BJM.

BJM proved at trial that it has provided services identical to the services that Norrell is now offering through Tascor. For example, in the early 1980s, BJM provided and serviced the entire people, functions, and productivity of the mail room, data center, cafeteria and paint shop at Clark Equipment Company. BJM had on-site supervisors in these departments and staffed the entire labor force of these departments. In the mid–1980s, BJM assumed and presently has responsibility for providing and servicing the entire people, function, and productivity of several departments, such as the mail room, data center, and assessment center, at the Toyota Motor Manufacturing plant in Georgetown, Kentucky. BJM is in charge of receiving all applications made through the Kentucky Human Resources Cabinet for employment at Toyota. BJM processes and screens these applications, determines which applicants qualify for initial testing and interviews, and conducts those tests and interviews. BJM then conducts additional rounds of tests and follow-up interviews of the applicants and determines which applicants qualify for final interviews with Toyota management.

Furthermore, BJM performs travel management services for American Express and data entry services for ClinTrials. Additionally, BJM has also provided facility management services to FMC in overseeing three warehouse locations and staffing FMC's cafeteria and medical departments.

*The offering of Management Services in BJM's protected territory*

BJM claims that Norrell's offering of its newly defined Management Services through Tascor violates Paragraph 8 of the Agreement in the respect that through Tascor, Norrell is operating a "similar type business" to BJM's business in BJM's protected territory. In essence, BJM alleges that Norrell has unilaterally withdrawn Management Ser-

vices from the Spectrum of Services formerly offered by it and that Norrell is now competing with BJM for business in BJM's protected territory.

It is clear from Eugene Obermeyer's testimony that Norrell's present concept of Management Services is different today than it was in the late 1980s and early 1990s. Based on Norrell's present definition of Management Services, franchisees are not authorized to offer such services under their agreements with Norrell. (Obermeyer, 5–6–93, pp. 18–22). Doug Miller also testified that franchisees are not authorized to sell Management Services. (Miller, Tr 6–30–93, pp. 108–109, 114).

Based on Norrell's redefinition of Management Services and Norrell's decision that its franchisees can no longer directly offer Management Services, Norrell takes the position that it is free to offer Management Services through Tascor in BJM's protected area and that such action would not violate the Agreement. The only criterion Norrell considers important in whether to market its Management Services in BJM's protected area is whether it is the "right business decision to make." (Obermeyer, 5–6–93, pp. 87–91). Norrell does not view Tascor as being in competition with its franchisees.

While Norrell denies that its activities in BJM's protected territory violate the Agreement, Norrell's denial is unsupported by the evidence on this point. In the early 1990s, Richard Olds, Norrell's former IBM account executive, made at least two visits to IBM in Lexington to sell "outsourcing" for corporate Norrell rather than on behalf of BJM. Further, BJM was unaware of these visits by Olds to IBM in Lexington at the time they were made. (Olds Depo., p. 20). Olds made a practice of not contacting the local franchisees when he made calls to an IBM plant because he did not want to be placed in the box of "temporary help services." (Moores, 4–16–93, pp. 37–55; 4–21–93, pp. 110–119). The following Olds' testimony indicates that he believed that the services he was selling for corporate Norrell were different from the services that BJM could offer IBM:

Q. When you visited the Lexington market and subsequently went back with Jeff Staples, were you trying to sell basically any type of business or were you just there for a specific type of business?

A. I was there specifically to sell outsourcing. Now, if I'm in the room with a guy like Combs and Staples is trying to sell temporary help while we're there or something, obviously I would help him do that.

Olds Depo., pp. 26–27.

When Olds called on IBM in Lexington in the early 1990s to sell outsourcing for corporate Norrell, he thought that BJM was not capable of selling outsourcing to IBM and that BJM's range of services was confined to "temporary help services." However, Olds subsequently learned that BJM had successfully provided similar services to Clark Equipment and Toyota. Olds had no reason to believe that BJM could not provide similar outsourcing and Management Services to IBM. (Olds Depo., pp. 36–37).

Richard Olds has not been the only corporate Norrell employee to call on IBM in Lexington on behalf of corporate Norrell rather than on behalf of BJM. In 1990, Donna O'Neill, formerly a sales representative to IBM for Norrell and presently a sales representative to IBM for Tascor, visited IBM in Lexington on a fact-finding trip "to see if they were interested in or had thought of management services." (O'Neill Depo., pp. 28–30). O'Neill did not contact BJM or include BJM on this sales call. (Id.).

Based on the foregoing evidence on this point, the Court finds that Norrell has attempted to sell its newly defined Management Services and outsourcing business, which is a "similar type business" to that which BJM had also been offering for many years, in BJM's protected area, in violation of Paragraph 8 of the Agreement. The Court further finds that Norrell, in marketing outsourcing and Management Services through Tascor, is competing for business with BJM in BJM's protected territory and encroaching on BJM's market and that such activity by Norrell is a material breach of the Agreement.

Having found that Norrell has materially breached the Agreement in at least two respects by having violated Paragraphs 8 and 19 of the Agreement, there is no need to address the remaining alleged violations by Norrell of the Agreement. The Court must next consider Norrell's counterclaim.

### 4. Liquidation fees

Norrell alleged that from July 1988 to July 1992, BJM failed to pay the required liquidation fees to it in violation of Paragraph 23 of the Agreement, which Norrell contended was a material breach of the Agreement. As a result of this alleged violation, Norrell seeks a determination that (1) the Agreement is terminated pursuant to Paragraph 44 of the Agreement, (2) the buy-out provision contained in Paragraph 46 cannot be exercised, and (3) the non-competition provisions of the Agreement are enforceable.

Paragraph 23 of the Agreement states in relevant part:

All liquidation fees collected by either party for temporary workers who are hired permanently shall be divided so that the Licensee shall receive fifty (50%) percent and Norrell fifty (50%) percent of such fees.

In 1987, BJM requested the assistance of Les Wharton, Norrell's in house counsel, in recovering liquidation fees from Oliver Trucking Company. Based on her communications with Les Wharton on this matter, Ms. Moores was left with the impression that Norrell preferred not to file a lawsuit against a client to collect a liquidation fee. Les Wharton advised Ms. Moores that Norrell would not share in the costs of such a collection suit and indicated to Ms. Moores that "whatever you get, you can keep it." (Moores, 4–20–93, pp. 92–94, 101–111). Based on this comment from Les Wharton, it was Ms. Moores' perception that BJM could collect liquidated damages at its own expense and could retain whatever was collected, even though such a practice was contrary to Paragraph 23 of the Agreement. Thus, from this point in 1987 until July 1992, BJM followed the practice of pursuing liquidation fees at its discretion and at its own expense and retain-

ing any amounts that were collected. (*Id.*). As seen from the January 19, 1990 memorandum to Safety–Kleen regarding the hiring of Cathy Weakley (PX 178), Norrell was aware that BJM had collected and retained liquidation fees; however, Norrell voiced no complaint to BJM about this matter until September 4, 1992, when it moved to amend its answer for the purpose of adding a counterclaim regarding liquidation fees.

After Plaintiffs filed this declaratory judgment action against Norrell, Ms. Moores concluded that Norrell would probably assert a counterclaim against her concerning the liquidation fees. Subsequently, Ms. Moores reviewed her file on liquidation fees collected between 1987 and 1992, determined that $12,200 represented 50% of the liquidation fees she had collected between 1987 and 1992, and on July 30, 1992, tendered a check to Norrell for $12,200 for Norrell's share of liquidation fees BJM had collected between July 1988 and July 1992, along with an itemization of the accounts that were collected. PX 179. Norrell accepted BJM's tendered check for $12,200 and has made no claims that BJM did not remit to it all of the liquidation fees to which it is entitled. PX 180.

On the subject of liquidation fees, Eugene Obermeyer testified that Norrell's course of conduct with a franchisee may be different from the terms of the franchise contract. (Obermeyer, Tr. 5–5–93, p. 28). Further, he was unaware of Norrell having any enforcement policy regarding liquidation fees. (*Id.*, pp. 39–40).

Based on (1) BJM's perception of Norrell's approach to liquidation fees gleaned from her communications with Les Wharton, Norrell's in-house counsel, (2) the parties' course of conduct from 1987 to 1992, wherein (a) BJM pursued liquidation fees at its discretion and at its own expense, and (b) Norrell made no demand for an accounting of liquidation fees from BJM from between 1987 and July 1992, (3) the fact that Norrell did not always follow its franchisee Agreements to the letter and had no policy *per se* concerning the enforcement of liquidation fees, and (4) the fact that BJM corrected any violation of Paragraph 23 of the Agreement by paying to Norrell liqui-

dation fees of $12,200, representing Norrell's portion of the liquidation fees that BJM had collected between July 1988 and July 1992, the Court finds that BJM's conduct in retaining the liquidation fees was not a material breach of the Agreement. Further, this immaterial breach of the Agreement was cured by BJM's payment of $12,200 to Norrell. Consequently, Norrell's counterclaim for liquidation fees is moot.

### 5. "Off-the-books" business

Norrell also claimed that BJM had been conducting "off-the-books" business in the sense that BJM had not been reporting all of its business generated under the Agreement to it. Norrell alleged that between April 1, 1987 and March 31, 1992, there was a discrepancy of more than $152,000 between BJM's bank deposits and the payments Norrell made to BJM during that same period of time. In other words, Norrell alleged that BJM had generated business under the Agreement and did not report this income to Norrell for purposes of their 50/50 split of profits.

In defending against this claim, BJM submitted its bank deposit slips, bank statements, and canceled checks for this period of time (April 1, 1987 through March 31, 1992) to Norrell's auditor, Ronald A. DiPietra, for review. In reviewing this information (PX 183—191 and 208), all but $104 out of the claimed discrepancy of $152,000 was resolved. Thereafter, Mr. DiPietra testified that he could find no fault with BJM's records. Thus, Norrell's claim that BJM had conducted "off-the-books" business to the tune of more than $152,000 over a period of five years was reduced to $104. Norrell subsequently abandoned its claim that BJM had conducted "off-the-books" business in violation of the Agreement.

### CONCLUSIONS OF LAW

#### A. *The Bonus Commission Program*

Based on the Court's finding that BJM, which divided its profits with Norrell on a 50/50 basis, was not similarly situated with Norrell's 40/60 franchisees, Norrell was under no obligation to include BJM in the

**1494**

Bonus Commission Program. *Canada Dry Corp. v. Nehi Beverage Co.*, 723 F.2d 512 (7th Cir.1983). Thus, BJM's claim that it should have been included in the Bonus Commission Program is without factual or legal foundation.

**B.** *The License Agreement*

**1.** *Direct Mailings*

■ It is undisputed that in 1990 Norrell stopped providing the four direct mailings to BJM it was required to provide under Paragraph 19 of the Agreement. Norrell argues that while it ceased to provide the four direct mailings per year to BJM, as called for by the Agreement, it has nonetheless "substantially complied" with the Agreement because it continued to provide advertising services, first in the form of print and national radio advertising and then more recently by providing BJM with a "Marketing Toolbox" that will enable BJM to provide its own local direct mail campaign.

The Court found no merit in Norrell's "substantial compliance" argument because the effect of Norrell's transition from the four direct mailings per year it was contractually obligated to provide BJM to print and national radio advertising and then to "franchisee-controlled marketing," was to shift this advertising cost to BJM, contrary to the Agreement. Under Norrell's current advertising scheme, BJM is now responsible for its own advertising, including the cost of printing, preparing, mailing and monitoring its local direct mail advertising, contrary to the Agreement. In support of its "substantial compliance" argument, Norrell argues that BJM has received "additional consideration" because BJM now receives the benefit of a national advertising campaign. Norrell relies on *Dennard v. Freeport Minerals Co.,* Ga., 250 Ga. 330, 297 S.E.2d 222 (1982), for the proposition that this "additional consideration" brings Norrell into "substantial compliance" with Paragraph 19 of the Agreement. However, substantial compliance was present in *Dennard* only because the plaintiff received "the exact bargained-for consideration *plus* additional consideration which did not in any way reduce or alter the value of the original bargained-for consideration."

*Id.* 297 S.E.2d at 225, n. 2. *Dennard* would be applicable to this action if BJM received the four direct mailings from Norrell plus the benefit of a national advertising campaign; however, since BJM did not receive the exact bargained-for consideration, *viz.*, the four direct mailings per year, *Dennard* is not relevant or applicable and does not support Norrell's "substantial compliance" argument.

The elimination of the four direct mailings Norrell was obligated to provide BJM under the Agreement at Norrell's own cost shifted the burden of these direct mailings to BJM and is a material breach of that Agreement.

**2.** *Norrell's offering of Management Services in BJM's protected area*

■ The Court has found that Norrell has redefined outsourcing and Management Services, that Norrell presently believes that outsourcing and Management Services can only be provided through its wholly-owned subsidiary, Tascor, and that Norrell has withdrawn outsourcing and Management Services from the Spectrum of Services that were routinely offered by its franchisees, including BJM, prior to May 8, 1992. The Court further found that through Tascor Norrell has marketed its Management Services business in BJM's protected area and that such activity by Norrell is a material breach of Paragraph 8 of the Agreement because the Management Services business is a "similar type business" to that which BJM is presently providing and has provided to its clientele for many years.

Based on these findings, the Court concludes that Norrell's decision that BJM can no longer offer Management Services and Norrell's marketing of these same or similar services in BJM's protected area violate Georgia law. *See Re/Max v. Real Estate Group on Peachtree, Inc.,* 201 Ga.App. 787, 412 S.E.2d 543 (1991). The Court cannot ignore Norrell's predatory conduct toward BJM, as seen in *Scheck v. Burger King Corporation,* 798 F.Supp. 692 (S.D.Fla.1992). In *Scheck*, a restaurant franchisee brought an action against its franchisor for authorizing the construction of a restaurant that would be competing with the franchisee.

The *Scheck* court ruled in favor of the franchisee, stating:

> ... If a franchise agreement gives the franchisor the right to build (or permit building) another store next door to the one earlier permitted, it had better say so in clear terms. If it does not—if the franchisor has not given unto itself the right to be predatory—then it should be prepared to defend its position on a good faith—that is, reasonable conduct—basis.

*Id.* at 699–700.

Norrell's conclusion that only Tascor had the capability of offering Management Services, as Norrell presently understands and defines Management Services, smacks of opportunistic behavior that the law will not tolerate, as noted in *The Original Great American Chocolate Chip Cookie Company, Inc. v. River Valley Cookies, Ltd.,* 970 F.2d 273 (7th Cir.1992). Although *Great American Chocolate Chip Cookie* is factually distinguishable from the present action, that court noted that there was a remedy for opportunistic behavior, stating:

> ... The law does as we have emphasized provide a remedy in the name of good faith against opportunistic behavior, in the sense of behavior designed to change the bargain struck by the parties in favor of the opportunist;

*Id.* at 281.

Norrell's actions toward BJM, at least since Norrell decided that Management Services could only be provided through Tascor, rather than by BJM, even though BJM has historically provided Management Services in its protected area to numerous clients, such as Clark Equipment Company, Toyota Motor Manufacturing Company, American Express Company, FMC, ClinTrials, and National City Bank, can only be characterized as opportunistic. By redefining Management Services and prohibiting its franchisees from offering these services, Norrell envisioned a way to increase its profits by decreeing that Management Services could only be offered through Tascor, its wholly-owned subsidiary. With Tascor being the sole provider of Management Services, Norrell would not have to divide the profits from these services with its franchisees, thereby increasing its profits from the Management Services business.

### 3. *The remedy*

■ Having found that Norrell has materially breached the Agreement and having concluded that BJM is entitled to relief from Norrell's conduct, the Court must fashion an appropriate remedy. It is well settled in Georgia that "[a] breach of a contract as to a matter so substantial and fundamental as to defeat the object of the contract may authorize a rescission of the contract by the opposite party." *Sinclair Refining Co. v. Davis,* 47 Ga.App. 601, 171 S.E. 150 (1933). This principal was reiterated in *Mayor and City of Douglasville v. Hildebrand,* 175 Ga.App. 434, 333 S.E.2d 674 (1985).

■ Norrell argues that BJM is not entitled to rescind the Agreement because it has not materially breached the Agreement. In Norrell's view of the world, it has the right to unilaterally redefine Management Services and to prohibit BJM from offering these services. For these reasons, Norrell also contends that the marketing of Management Services through Tascor in BJM's protected area does not violate the Agreement because Management Services are different from the services BJM is capable of offering. Norrell submits that even if the Court determines that BJM has provided Management Services, as Norrell presently defines Management Services, Norrell has not violated the Agreement by offering Management Services through Tascor in BJM's protected area. Norrell further contends that even if the Court concludes that Norrell has breached the Agreement by offering Management Services in competition with BJM in BJM's protected area, BJM is not entitled to rescind the Agreement because the parties cannot be restored to the positions they were in prior to entering into the Agreement on July 15, 1977.

■ As a general rule in Georgia, one who seeks to rescind a contract must return whatever he has received under the contract. However, as seen in *International Software Solutions, Inc. v. Atlanta Pressure Treated Lumber Company,* 194 Ga.App. 441, 390 S.E.2d 659 (1990), this rule is not absolute

and must be applied reasonably. The *International Software* court recognized:

> The rule that he who desires to rescind a contract must restore whatever he has received under it is one of justice and equity ... and must be reasonably applied. The object of the rule is theoretically to place the parties in status quo; but the rule is equitable, not technical, and does not require more than that such restoration be made as is reasonably possible and such as the merits of the case demand.

*Id.* 390 S.E.2d at 661. Subsequent Georgia case law also noted that the return-of-consideration rule in rescission cases is equitable, not absolute. *See Crews v. Cisco Brothers Ford–Mercury, Inc.,* 201 Ga.App. 589, 411 S.E.2d 518 (1991), and *Gunnin v. Dement,* 205 Ga.App. 631, 422 S.E.2d 893 (1992). Thus, a contract may be rescinded in certain situations even though it is not possible to return the parties to the status quo.

Norrell also argues that the Agreement cannot be rescinded because BJM cannot return to Norrell the "know-how" of the "Norrell System" which BJM has learned from Norrell since July 15, 1977. Concerning the "Norrell System," no proof was submitted at trial to indicate that the "Norrell System" is unique. The "collateral materials" referred to by Eugene Obermeyer (Obermeyer Depo., p. 10) are similar to those of Norrell's competitors. Additionally, even though Guy Millner, Norrell's Chairman of the Board and CEO, asserts that Norrell's Master Vendor Program is "more complete" than that of Norrell's competitors, the Master Vendor Program is not unique to Norrell. (Millner Depo., pp. 99–100). One feature which may be unique to the "Norrell System" is I.R.I.S., a quality control tool that is computer-generated and is sent to all employers using a Norrell temporary employee for an evaluation of that employee's performance. However, a Norrell franchisee cannot utilize I.R.I.S. without also using Norrell's computer system and Norrell's B.O.S.S. software. Due to the fact that BJM returned Norrell's computer and the B.O.S.S. software to Norrell in July 1992, BJM presently has no information, manuals, computer disks, or any other materials pertaining to I.R.I.S. (PX 149, paragraph 20).

Norrell has cited no authority to support its argument that the "Norrell System" constitutes unique "know-how." However, there is authority to the contrary. In *Scott v. Snelling and Snelling, Inc.,* 732 F.Supp. 1034 (N.D.Cal.1990), the court held that a temporary services franchisor's customer list, business forms and procedures, and temporary employee list were not trade secrets. *Scott* construes Section 1 of the Uniform Trade Secrets Act, which is identical, except for numbering, to Georgia Statute O.C.G.A. 10–1–761(4).[3] *Scott* held that the customer list of the temporary services franchisor was not protectable because it contained "information which is readily available through public sources such as directories" *Id.* at 1044. Therefore, such information does not "derive the independent economic value necessary to the existence of a trade secret." *Id.* The *Scott* court further noted:

> The assertion that the customer lists constitute a trade secret in the context of a TPS [temporary placement service] can be dismissed as a matter of law without much difficulty. As indicated in the plaintiffs' evidentiary submissions, and uncontroverted by Snelling, the typical customers of a TPS business are large and small companies of all sorts, easily discoverable through public sources. Plaintiffs have also demonstrated for the purposes of their motion that they developed the customer lists through their own efforts, personal knowledge and business contacts. In such circumstances, the California courts have repeatedly held that a customer list

---

**3.** O.C.G.A. 10–1–761(4) states:

"Trade secret" means information including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which:

(A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; *and*
(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

does not constitute a trade secret for the purposes of enforcing a covenant restraining competition because '[e]quity has no power to compel a man who changes employers to wipe clean the slate of his memory.' [citation omitted]. The Court therefore holds that the customer lists at issue in this case do not constitute trade secrets as a matter of law.

*Id.* at 1044–45.

BJM proved at trial that the names of its clients are readily discoverable through public sources, such as the local Chamber of Commerce directory and the yellow pages in the local telephone directory. BJM also proved that it has developed its own customer list, without any assistance from Norrell, through the efforts of Ms. Moores and her employees. (Moores, Tr. 4–6–93, pp. 116–118; Tr. 4–20–93, pp. 19–25). There was no proof that Norrell ever provided BJM with a business lead or contact for a client. Based on the evidence that BJM's customers are also available to BJM's competitors within BJM's protected area, the Court concludes, consistent with *Scott,* that BJM's customer list is not a trade secret.

On the issue of whether the employee list of the franchisor of temporary placement services is a trade secret, *Scott* held that such a list was not a trade secret in that instance because the franchisee proved that it, rather than the franchisor, had developed its employee list through its own efforts. *Id.* In the present action, there is no proof that Norrell expended any effort in developing BJM's employee lists. To the contrary, BJM's employees were recruited by BJM and its staff, and BJM's employee lists were established exclusively by BJM without any assistance from Norrell. (PX 149). Therefore, based on *Scott,* BJM's employee lists are not trade secrets.

Concerning whether the methods and procedures comprising the "Norrell System" might be protectable as a trade secret, *Scott* considered this question and held that the business forms and procedures utilized by the franchisor of a temporary placement service were not trade secrets because they were widely used within the industry. *Id.* at 1045. BJM proved that Norrell's forms and procedures are in general use within the industry, that they are modeled after similar information used by Norrell's competitors, and that they can be purchased over-the-counter from private vendors through catalogs. (Moores, Tr. 4–20–93, pp. 8–35). Therefore, based on *Scott* and the proof at trial, the Court concludes as a matter of law that the methods, business forms, and procedures that comprise the "Norrell System" are not trade secrets.

In determining whether the Agreement should be rescinded, the Court must consider the fact that BJM has developed the market in its protected territory, has secured the clients, has secured the employees, and has spent seventeen years financing and developing its own business. Norrell provided forms to BJM, along with periodic visits to BJM from Russell Baker and Mary Jane Good. Norrell has also provided payrolling and billing services to BJM; however, Norrell has changed the manner in which it provides bookkeeping services incident to the payroll to the extent that now more time is required by BJM to put the payroll information on a computer disk to send to Norrell for processing. Norrell has been well-paid for the services provided to BJM. For the five fiscal years from October 31, 1988 through October 31, 1992, BJM has paid Norrell $2,200,000.00. (PX 158).

In considering the manner in which the parties have dealt with each other since July 15, 1977, the Court concludes as a matter of law that it is not possible for BJM to return the consideration to Norrell and that it is not possible to return Norrell and BJM to the status quo. During the course of the past few years, a chasm developed between the parties. Norrell's decision in 1989 to eliminate the four direct mailings it was contractually obligated to provide to BJM helped fuel the fires that led to this chasm, and Norrell's redefinition of Management Services and formation of Tascor for the purpose of marketing Management Services resulted in this abyss becoming deeper and wider. At this point in time, the impasse between BJM and Norrell has become impossible to bridge. It is time for the bickering between BJM and Norrell to come to an end. Based on the

evidence and the facts peculiar to this case, the Court concludes that the only sure-fire way to stop the bickering between BJM and Norrell is to rescind the Agreement. In this situation, rescission of the Agreement is equitable to both parties.

### 4. The covenants not to compete

■ Having concluded that the Agreement should be rescinded, the Court must also determine whether the restrictive covenants found in the Agreement are enforceable. The principal restrictive covenant is set out in Paragraph 35 of the Agreement and states:

> 35. *Restrictive Covenant.* The Licensee agrees that during the life of this Agreement, and for a period of one (1) year after its termination or expiration, for the protection of Norrell, the Licensee will not directly or indirectly engage in the operation of a temporary help business similar to that conducted under this Agreement in any capacity in which he will perform any of the duties he performs under this Agreement with any other person, agent, corporation, association or otherwise, in the territorial area covered by this Agreement. Provided however, that said one (1) year period shall not run during such time, if any, in which the Licensee is violating the restrictive covenant contained in this paragraph.

■ The construction of a covenant not to compete is purely a matter of law. *Jarrett v. Hamilton,* 179 Ga.App. 422, 346 S.E.2d 875 (1986). In Georgia, a covenant prohibiting competition with the coventatee "in any capacity" has been held to be too broadly restrictive and thus unenforceable. In *Fields v. Rainbow International Carpet Dyeing*

*and Cleaning Co.,* 259 Ga. 375, 380 S.E.2d 693 (1989), the court reaffirmed that "a restriction of employment in business 'in any capacity' is overbroad and unreasonable,' and therefore unenforceable." *Id.* If any part of a covenant not to compete is unenforceable, the entire covenant is unenforceable.[4] Since Paragraph 35 restricts BJM from competing with Norrell "in any capacity," this entire covenant not to compete is unenforceable against BJM.

In arguing that Paragraph 35 should be enforceable against BJM, Norrell submits that the Georgia Supreme Court has upheld virtually identical restrictive covenants, referring to *Sheppard v. Norrell Services, Inc.,* 407 S.E.2d 762 (Table) (Ga.1991), which is a one-sentence statement affirming the trial court's decision; there is no accompanying opinion to explain the appellate decision. In the absence of an opinion explaining the reasons why the trial court's decision was affirmed, *Sheppard* has little, if any, precedential value. The restrictive covenant at issue in *Sheppard* stated:

> Franchisee shall not, without the prior written consent of NORRELL, within the Area, either directly or indirectly, on its own behalf or in the service or on behalf of others, engage in or be employed by any Temporary Help Service Business other than the Franchised Business (any such other business being herein referred to as a 'Competing Business') as a partner, officer, executive or managerial employee, guarantor, director, shareholder ..., consultant or salesperson.

(Trial Court Opinion, p. 10). It is clear that the restrictive covenant in *Sheppard* is not "virtually identical" to Paragraph 35 of the Agreement.[5] Thus, Norrell's argument that

---

4. In 1990, Georgia's legislature enacted a "blue-penciling" statute (O.C.G.A. 13–8–2.1) which would have permitted courts to sever unconstitutional provisions of a restrictive covenant from other provisions in covenants not to compete. However, in 1991 in *Jackson & Coker, Inc. v. Hart,* 261 Ga. 371, 405 S.E.2d 253 (1991), the Georgia Supreme Court held this "blue-penciling" statute to be unconstitutional under Georgia's 1983 Constitution. Therefore, as seen in *A.L. Williams & Associates v. Stelk,* 960 F.2d 942, 946 (11th Cir.1992), "overly broad covenants may not be salvaged by excising—or 'blue-pencil-

ing'—their unenforceable provisions. If any part of a covenant is unenforceable, the entire covenant must fall."

5. The *Sheppard* covenant did not use the language "in any capacity," which was condemned in *Jackson & Coker v. Hart,* 261 Ga. 371, 405 S.E.2d 253 (1991), which held that the "blue-penciling" statute was unconstitutional. Further, the record reflects that the *Sheppard* appellate decision, was published on June 27, 1991, the same day that the Georgia Supreme Court rendered *Jackson & Coker v. Hart, supra.* The

*Sheppard* supports enforcement of Paragraph 35 against BJM is without legal foundation.

Norrell also argues that Paragraph 35 modifies the language "in any capacity" by the phrase following immediately thereafter "in which he will perform any of the duties he performs under this Agreement." Without any supporting authority, Norrell contends that this case is no longer any "in any capacity" case.

Assuming *arguendo* that Norrell is correct that the modifying language "in which he will perform any of the duties he performs under this Agreement" distinguishes this case from the "in any capacity" case, the "in any capacity" language is revived by the inclusion of the phrase "or otherwise," as seen in *Arnall Insurance Agency, Inc. v. Arnall*, 196 Ga. App. 414, 396 S.E.2d 257 (1990), which relied on *Jarrett v. Hamilton, supra*, in holding:

> ... In the case *sub judice*, we find the words 'or otherwise,' following a list of proscribed activities, to be the "functional equivalent of the phrase 'in any capacity' ..." *Jarrett v. Hamilton*, supra at 424, 346 S.E.2d 875. The words render the restrictive covenant unreasonable inasmuch as they limit the activities of defendant more than is necessary to protect the plaintiff. *Howard Schultz & Assoc. v. Broniec*, 239 Ga. 181, 236 S.E.2d 265, [1977] *supra; McNease v. Nat. Motor Club*, 238 Ga. 53, 231 S.E.2d 58, *supra*. It follows that the restrictive covenant is unenforceable.

*Arnall*, 396 S.E.2d at 260.

Based on the fact that Paragraph 35 contains the language "or otherwise" that was held to be fatal to the restrictive covenant in *Arnall*, the Court holds that Paragraph 35 is unenforceable against BJM.

Norrell further argues that this covenant not to compete is reasonable and should be enforced when the franchisee is the "heart and soul" of the business. In support of this argument, Norrell relies on *Watson v. Waffle House, Inc.*, 253 Ga. 671, 324 S.E.2d 175 (1985). In *Watson*, Waffle House leased a Waffle House restaurant to the Watsons in 1978. Their lease agreement provided that upon termination of the lease, the Watsons could not compete with Waffle House by engaging in the restaurant or fast food business within a five-mile radius for a period of two years. The lease was renewed every year after 1978 until 1984, when the Watsons opened a new restaurant .4 mile from the previously leased Waffle House. Waffle House sued the Watsons to enforce the anti-competition provision in the lease agreement. The trial court determined that the anticompetition provision was reasonable and should be enforced. The *Watson* court affirmed on appeal; however, the *Watson* court expressly stated, "we do not view this as an 'in any capacity case.'" *Id.* 324 S.E.2d at 178.

Since *Watson* is not an "in any capacity" case, it is not applicable to the present action which is clearly an "in any capacity" case.

■■■ The Court also concludes that since the restrictive covenant in Paragraph 35 is overly broad and unenforceable, the remaining restrictive covenants in the Agreement found in Paragraphs 39 and 39A are also unenforceable, as seen in *Ward v. Process Control Corporation*, 247 Ga. 583, 277 S.E.2d 671 (1981), which held:

> If any covenant not to compete within a given employment contract is unreasonable either in time, territory, or prohibited business activity, then all covenants not to compete with the same employment contract are unenforceable.

*Id.* 277 S.E.2d at 673. Even though the Agreement between BJM and Norrell may not be an employment contract *per se*, the principle is applicable by analogy that when one restrictive covenant in a contract is unreasonable and thus unenforceable, all other restrictive covenants contained therein are likewise unenforceable.

## II. CONCLUSION

Having concluded that Plaintiffs, BJM and Barbara Jane Moores, should prevail in this matter and that the Agreement between

---

*Sheppard* trial court cited Georgia's "blue-penciling" statute (O.C.G.A. 13-8-2.1) in its opinion; therefore, the opinion by the trial court in *Shep-* *pard* is constitutionally infirm to the extent the *Sheppard* trial court relied on this unconstitutional statute in making its decision.

BJM and Norrell should be rescinded, an Order and Judgment in favor of the Plaintiffs will be contemporaneously entered in accordance with the foregoing Findings of Fact and Conclusions of Law.

## ORDER AND JUDGMENT

In accordance with the Findings of Fact and Conclusions of Law entered on the same date herewith,

**IT IS HEREBY ORDERED** and **ADJUDGED** that:

1. The License Agreement entered into by BJM and Norrell on July 15, 1977, which was renewed by the parties on July 15, 1987, and which will expire on its own terms on July 15, 1997, is hereby **RESCINDED** effective as of the date of this Order and Judgment.

2. The restrictive covenants contained in Paragraphs 35, 39, and 39A of the License Agreement are unenforceable under Georgia law against BJM. Accordingly, effective as of the date of this Order and Judgment, BJM and Norrell are free to go their separate ways and to compete with each other for business in the territory formerly identified as BJM's protected territory.

3. BJM's claim that Norrell discriminated against it by not allowing BJM to participate in the Bonus Commission Program from April 1991 through December 1991 is without merit.

4. Judgment is entered in favor of BJM on Norrell's counterclaim regarding the liquidation fees.

5. Within thirty (30) days of the date of this Order and Judgment, BJM shall return to Norrell any and all manuals, documents, and other materials that Norrell provided to BJM as part of the "Norrell System."

6. Within thirty (30) days of the date of this Order and Judgment, Norrell shall provide an accounting to BJM for all monies due and owing BJM prior to the rescission of the Agreement, including the reserve for bad debts and the workers' compensation insurance provided to BJM employees.

7. Norrell's motions for a temporary restraining order [DE # 225] and a preliminary injunction [DE # 226] concerning the manner in which BJM answers incoming telephone calls placed to BJM's office, and Norrell's motion for oral argument [DE # 224] on its motions for a temporary restraining order and a preliminary injunction are **DENIED AS MOOT.**

8. All issues having been resolved, this action is **DISMISSED** and **STRICKEN** from the docket.

9. There being no just reason for delay, this is a **FINAL** and **APPEALABLE** Order and Judgment.